# DUTTON, WARDEN *v.* EVANS

No. 10.   Argued October 15, 1969—Reargued October 15, 1970—
Decided December 15, 1970

75

STEWART, J., announced the Court's judgment and delivered an opinion, in which BURGER, C. J., and WHITE and BLACKMUN, JJ., joined. BLACKMUN, J., filed a concurring opinion, in which BURGER, C. J., joined, *post*, p. 90. HARLAN, J., filed an opinion concurring in the result, *post*, p. 93. MARSHALL, J., filed a dissenting opinon, in which BLACK, DOUGLAS, and BRENNAN, JJ., joined, *post*, p. 100.

*Alfred L. Evans, Jr.,* Assistant Attorney General of Georgia, reargued the cause for appellant. With him on the brief were *Arthur K. Bolton,* Attorney General, and *Marion O. Gordon* and *Mathew Robins,* Assistant Attorneys General.

*Robert B. Thompson* reargued the cause and filed a brief for appellee.

*Solicitor General Griswold,* by invitation of the Court, argued the cause for the United States as *amicus curiae* on the reargument. With him on the brief were *Assistant Attorney General Wilson, Jerome M. Feit, Beatrice Rosenberg,* and *Roger A. Pauley.*

Mr. Justice Stewart announced the judgment of the Court and an opinion in which The Chief Justice, Mr. Justice White, and Mr. Justice Blackmun join.

Early on an April morning in 1964, three police officers were brutally murdered in Gwinnett County, Georgia. Their bodies were found a few hours later, handcuffed together in a pine thicket, each with multiple gunshot wounds in the back of the head. After many months of investigation, Georgia authorities charged the appellee, Evans, and two other men, Wade Truett and Venson Williams, with the officers' murders. Evans and Williams were indicted by a grand jury; Truett was granted immunity from prosecution in return for his testimony.

Evans pleaded not guilty and exercised his right under Georgia law to be tried separately. After a jury trial, he was convicted of murder and sentenced to death.[1] The judgment of conviction was affirmed by the Supreme Court of Georgia,[2] and this Court denied certiorari.[3] Evans then brought the present habeas corpus proceeding in a federal district court, alleging, among other things, that he had been denied the constitutional right of confrontation at his trial. The District Court denied the writ,[4] but the Court of Appeals for the Fifth Circuit reversed, holding that Georgia had, indeed, denied Evans the right, guaranteed by the Sixth and Fourteenth Amendments, "to be confronted by the witnesses against him."[5] From that judgment an appeal was brought to this Court, and we noted probable jurisdiction.[6] The

---

[1] The parties agree that this death sentence cannot be carried out. See n. 20, *infra*.

[2] *Evans* v. *State*, 222 Ga. 392, 150 S. E. 2d 240.

[3] 385 U. S. 953.

[4] The opinion of the District Court is unreported.

[5] *Evans* v. *Dutton*, 400 F. 2d 826, 827.

[6] 393 U. S. 1076. Since, as will appear, the Court of Appeals held that a Georgia statute relied upon by the State at the trial was unconstitutional as applied, there can be no doubt of the right of appeal to this Court. 28 U. S. C. § 1254 (2).

case was originally argued last Term, but was set for reargument. 397 U. S. 1060.

In order to understand the context of the constitutional question before us, a brief review of the proceedings at Evans' trial is necessary. The principal prosecution witness at the trial was Truett, the alleged accomplice who had been granted immunity. Truett described at length and in detail the circumstances surrounding the murder of the police officers. He testified that he, along with Evans and Williams, had been engaged in switching the license plates on a stolen car parked on a back road in Gwinnett County when they were accosted by the three police officers. As the youngest of the officers leaned in front of Evans to inspect the ignition switch on the car, Evans grabbed the officer's gun from its holster. Evans and Williams then disarmed the other officers at gunpoint, and handcuffed the three of them together. They then took the officers into the woods and killed them by firing several bullets into their bodies at extremely close range. In addition to Truett, 19 other witnesses testified for the prosecution.[7] Defense counsel was given full opportunity to cross-examine each witness, and he exercised that opportunity with respect to most of them.

One of the 20 prosecution witnesses was a man named Shaw. He testified that he and Williams had been fellow prisoners in the federal penitentiary in Atlanta, Georgia, at the time Williams was brought to Gwinnett County to be arraigned on the charges of murdering the police officers. Shaw said that when Williams was returned to the penitentiary from the arraignment, he had asked Williams: "How did you make out in court?" and that Williams had responded, "If it hadn't been for that dirty son-of-a-bitch Alex Evans, we wouldn't be in this now." Defense counsel objected to the introduction

---

[7] Three of these were rebuttal witnesses. There were four defense witnesses, and Evans himself made a lengthy unsworn statement.

of this testimony upon the ground that it was hearsay and thus violative of Evans' right of confrontation. After the objection was overruled, counsel cross-examined Shaw at length.

The testimony of Shaw relating what he said Williams had told him was admitted by the Georgia trial court, and its admission upheld by the Georgia Supreme Court, upon the basis of a Georgia statute that provides: "After the fact of conspiracy shall be proved, the declarations by any one of the conspirators during the pendency of the criminal project shall be admissible against all." [8] As the appellate court put it:

> " 'The rule is that so long as the conspiracy to conceal the fact that a crime has been committed or the identity of the perpetrators of the offense continues, the parties to such conspiracy are to be considered so much a unit that the declarations of either are admissible against the other.' The defendant, and his co-conspirator, Williams, at the time this statement was made, were still concealing their identity, keeping secret the fact that they had killed the deceased, if they had, and denying their guilt. There was evidence sufficient to establish a prima facie case of conspiracy to steal the automobile and the killing of the deceased by the conspirators while carrying out the conspiracy, and the statement by Williams made after the actual commission of the crime, but while the conspiracy continued was admissible." [9] (Citations omitted.)

This holding was in accord with a consistent line of Georgia decisions construing the state statute. See, e. g., *Chatterton v. State*, 221 Ga. 424, 144 S. E. 2d 726,

[8] Ga. Code Ann. § 38–306 (1954).
[9] *Evans* v. *State*, 222 Ga. 392, 402, 150 S. E. 2d 240, 248.

cert. denied, 384 U. S. 1015; *Burns* v. *State,* 191 Ga. 60, 73, 11 S. E. 2d 350, 358.

It was the admission of this testimony of the witness Shaw that formed the basis for the appellee's claim in the present habeas corpus proceeding that he had been denied the constitutional right of confrontation in the Georgia trial court. In upholding that claim, the Court of Appeals for the Fifth Circuit regarded its duty to be "not only to interpret the framers' original concept in light of historical developments, but also to translate into due-process terms the constitutional boundaries of the hearsay rule." [10] (Footnotes omitted.) The court upheld the appellee's constitutional claim because it could find no "salient and cogent reasons" for the exception to the hearsay rule Georgia applied in the present case, an exception that the court pointed out was broader than that applicable to conspiracy trials in the federal courts.[11]

The question before us, then, is whether in the circumstances of this case the Court of Appeals was correct in holding that Evans' murder conviction had to be set aside because of the admission of Shaw's testimony. In considering this question, we start by recognizing that this Court has squarely held that "the Sixth Amendment's right of an accused to confront the witnesses against him is . . . a fundamental right . . . made obligatory on the States by the Fourteenth Amendment." *Pointer* v. *Texas,* 380 U. S. 400, 403. See also *Douglas* v. *Alabama,* 380 U. S. 415; *Brookhart* v. *Janis,* 384 U. S. 1; *Barber* v. *Page,* 390 U. S. 719; *Roberts* v. *Russell,* 392 U. S. 293; *Illinois* v. *Allen,* 397 U. S. 337; *California* v. *Green,* 399 U. S. 149. But that is no more than the beginning of our inquiry.

---

[10] 400 F. 2d, at 829.
[11] 400 F. 2d, at 830, 831.

## I

It is not argued, nor could it be, that the constitutional right to confrontation requires that no hearsay evidence can ever be introduced. In the *Pointer* case itself, we referred to the decisions of this Court that have approved the admission of hearsay:

> "This Court has recognized the admissibility against an accused of dying declarations, *Mattox* v. *United States,* 146 U. S. 140, 151, and of testimony of a deceased witness who has testified at a former trial, *Mattox* v. *United States,* 156 U. S. 237, 240–244. See also *Dowdell* v. *United States, supra,* 221 U. S., at 330; *Kirby* v. *United States, supra,* 174 U. S., at 61. . . . There are other analogous situations which might not fall within the scope of the constitutional rule requiring confrontation of witnesses." [12]

The argument seems to be, rather, that in any given case the Constitution requires a reappraisal of every exception to the hearsay rule, no matter how long established, in order to determine whether, in the words of the Court of Appeals, it is supported by "salient and cogent reasons." The logic of that position would seem to require a constitutional reassessment of every established hearsay exception, federal or state, but in the present case it is argued only that the hearsay exception applied by Georgia is constitutionally invalid because it does not identically conform to the hearsay exception applicable to conspiracy trials in the federal courts. Appellee does not challenge and we do not question the validity of the coconspirator exception applied in the federal courts.

---

[12] *Pointer* v. *Texas,* 380 U. S., at 407. See also *Salinger* v. *United States,* 272 U. S. 542, 548.

That the two evidentiary rules are not identical must be readily conceded. It is settled that in federal conspiracy trials the hearsay exception that allows evidence of an out-of-court statement of one conspirator to be admitted against his fellow conspirators applies only if the statement was made in the course of and in furtherance of the conspiracy, and not during a subsequent period when the conspirators were engaged in nothing more than concealment of the criminal enterprise. *Lutwak v. United States,* 344 U. S. 604; *Krulewitch v. United States,* 336 U. S. 440. The hearsay exception that Georgia applied in the present case, on the other hand, permits the introduction of evidence of such an out-of-court statement even though made during the concealment phase of the conspiracy.

But it does not follow that because the federal courts have declined to extend the hearsay exception to include out-of-court statements made during the concealment phase of a conspiracy, such an extension automatically violates the Confrontation Clause. Last Term in *California v. Green,* 399 U. S. 149, we said:

"Our task in this case is not to decide which of these positions, purely as a matter of the law of evidence, is the sounder. The issue before us is the considerably narrower one of whether a defendant's constitutional right 'to be confronted with the witnesses against him' is necessarily inconsistent with a State's decision to change its hearsay rules . . . . While it may readily be conceded that hearsay rules and the Confrontation Clause are generally designed to protect similar values, it is quite a different thing to suggest that the overlap is complete and that the Confrontation Clause is nothing more or less than a codification of the rules of hearsay and their exceptions as they existed historically at common law. Our decisions have never established

> such a congruence; indeed, we have more than once found a violation of confrontation values even though the statements in issue were admitted under an arguably recognized hearsay exception. The converse is equally true: merely because evidence is admitted in violation of a long-established hearsay rule does not lead to the automatic conclusion that confrontation rights have been denied." *Id.*, at 155–156 (citations and footnote omitted).

These observations have particular force in the present case. For this Court has never indicated that the limited contours of the hearsay exception in federal conspiracy trials are required by the Sixth Amendment's Confrontation Clause. To the contrary, the limits of this hearsay exception have simply been defined by the Court in the exercise of its rule-making power in the area of the federal law of evidence.[13] It is clear that the limited scope of the hearsay exception in federal conspiracy trials is a product, not of the Sixth Amendment, but of the Court's "disfavor" of "attempts to broaden the already pervasive and wide-sweeping nets of conspiracy prosecutions." *Grunewald* v. *United States*, 353 U. S. 391, 404. As *Grunewald, Krulewitch,* and other cases in this Court make clear, the evidentiary rule is intertwined, not only with the federal substantive law of conspiracy, but also with such related issues as the impact of the statute of limitations upon conspiracy prosecutions.

---

[13] See 18 U. S. C. § 3771. Fed. Rule Crim. Proc. 26 provides:

"In all trials the testimony of witnesses shall be taken orally in open court, unless otherwise provided by an act of Congress or by these rules. The admissibility of evidence and the competency and privileges of witnesses shall be governed, except when an act of Congress or these rules otherwise provide, by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience."

See *Hawkins* v. *United States*, 358 U. S. 74.

In the case before us such policy questions are not present. Evans was not prosecuted for conspiracy in the Georgia court, but for the substantive offense of murder.[14] At his trial the State permitted the introduction of evidence under a long-established and well-recognized rule of state law.[15] We cannot say that the evidentiary rule applied by Georgia violates the Constitution merely because it does not exactly coincide with the hearsay exception applicable in the decidedly different context of a federal prosecution for the substantive offense of conspiracy.

## II

It is argued, alternatively, that in any event Evans' conviction must be set aside under the impact of our recent decisions that have reversed state court convictions because of the denial of the constitutional right of confrontation. The cases upon which the appellee Evans primarily relies are *Pointer* v. *Texas, supra; Doug-*

---

[14] We are advised that at the time of Evans' trial Georgia did not recognize conspiracy as a separate, substantive criminal offense.

[15] The Georgia rule is hardly unique. See, *e. g., Reed* v. *People,* 156 Colo. 450, 402 P. 2d 68; *Dailey* v. *State,* 233 Ala. 384, 171 So. 729; *State* v. *Roberts,* 95 Kan. 280, 147 P. 828. See also 2 F. Wharton, Criminal Evidence § 430 (12th ed. 1955):

"The acts and declarations of a conspirator are admissible against a co-conspirator when they are made during the pendency of the wrongful act, and this includes not only the perpetration of the offense but also its subsequent concealment. . . .

. . . . .

"The theory for the admission of such evidence is that persons who conspire to commit a crime, and who do commit a crime, are as much concerned, after the crime, with their freedom from apprehension, as they were concerned, before the crime, with its commission: the conspiracy to commit the crime devolves after the commission thereof into a conspiracy to avoid arrest and implication."

The existence of such a hearsay exception in the evidence law of many States was recognized in *Krulewitch, supra.* 336 U. S., at 444.

las v. *Alabama, supra; Brookhart* v. *Janis, supra; Barber* v. *Page, supra;* and *Roberts* v. *Russell, supra.*

In the *Pointer* case it appeared that a man named Phillips had been the victim of a robbery in Texas. At a preliminary hearing, Phillips "as chief witness for the State gave his version of the alleged robbery in detail, identifying petitioner as the man who had robbed him at gunpoint." 380 U. S., at 401. Pointer had no lawyer at this hearing and did not try to cross-examine Phillips. At Pointer's subsequent trial the prosecution was permitted to introduce the transcript of Phillips' testimony given at the preliminary hearing. Thus, as this Court held, the State's "use of the transcript of that statement at the trial denied petitioner any opportunity to have the benefit of counsel's cross-examination of the principal witness against him." 380 U. S., at 403. The *Douglas* case, decided the same day as *Pointer,* involved an even more flagrant violation of the defendant's right of confrontation. For at Douglas' trial the prosecutor himself was permitted to read an "entire document" purporting to be an accomplice's written confession after the accomplice had refused to testify in reliance upon his privilege against compulsory self-incrimination. "The statements from the document as read by the Solicitor recited in considerable detail the circumstances leading to and surrounding the alleged crime; of crucial importance, they named the petitioner as the person who fired the shotgun blast which wounded the victim." 380 U. S., at 417. In reversing Douglas' conviction, this Court pointed out that the accomplice's reliance upon the privilege against compulsory self-incrimination "created a situation in which the jury might improperly infer both that the statement had been made and that it was true." 380 U. S., at 419. Yet, since the prosecutor was "not a witness, the inference from his reading that [the accomplice] made the statement could not be

tested by cross-examination. Similarly, [the accomplice] could not be cross-examined on a statement imputed to but not admitted by him." *Ibid.*

*Brookhart* v. *Janis* and *Barber* v. *Page* are even further afield. In *Brookhart* it appeared that the petitioner had been "denied the right to cross-examine at all any witnesses who testified against him," and that, additionally, "there was introduced as evidence against him an alleged confession, made out of court by one of his co-defendants . . . who did not testify in court." 384 U. S., at 4. The only issue in the case was one of waiver, since the State properly conceded that such a wholesale and complete "denial of cross-examination without waiver . . . would be constitutional error of the first magnitude . . . ." 384 U. S., at 3. In *Barber* the "principal evidence" against the petitioner was a transcript of preliminary hearing testimony admitted by the trial judge under an exception to the hearsay rule that, by its terms, was applicable only if the witness was "unavailable." This hearsay exception "has been explained as arising from necessity . . . ." 390 U. S., at 722, and we decided only that Oklahoma could not invoke that concept to use the preliminary hearing transcript in that case without showing "a good-faith effort" to obtain the witness' presence at the trial. *Id.*, at 725.

In *Roberts* v. *Russell* we held that the doctrine of *Bruton* v. *United States,* 391 U. S. 123, was applicable to the States and was to be given retroactive effect. But *Bruton* was a case far different from the one now before us. In that case there was a joint trial of the petitioner and a codefendant, coincidentally named Evans, upon a charge of armed postal robbery. A postal inspector testified that Evans had confessed to him that Evans and the petitioner had committed the robbery. This evidence was, concededly, wholly inadmissible against the petitioner. Evans did not testify. Although the trial judge

instructed the jury to disregard the evidence of Evans' confession in considering the question of the petitioner's guilt, we reversed the petitioner's conviction.   The primary focus of the Court's opinion in *Bruton* was upon the issue of whether the jury in the circumstances presented could reasonably be expected to have followed the trial judge's instructions.   The Court found that "[t]he risk of prejudice in petitioner's case was even more serious than in *Douglas*," because "the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial." 391 U. S., at 127, 135–136.   Accordingly, we held that "in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination."   391 U. S., at 137. There was not before us in *Bruton* "any recognized exception to the hearsay rule," and the Court was careful to emphasize that "we intimate no view whatever that such exceptions necessarily raise questions under the Confrontation Clause."   391 U. S., at 128 n. 3.

It seems apparent that the Sixth Amendment's Confrontation Clause and the evidentiary hearsay rule stem from the same roots.[16]   But this Court has never equated the two,[17] and we decline to do so now.   We confine ourselves, instead, to deciding the case before us.

---

[16] It has been suggested that the constitutional provision is based on a common-law principle that had its origin in a reaction to abuses at the trial of Sir Walter Raleigh. F. Heller, The Sixth Amendment 104 (1951).

[17] See Note, Confrontation and the Hearsay Rule, 75 Yale L. J. 1434:

"Despite the superficial similarity between the evidentiary rule and the constitutional clause, the Court should not be eager to equate them.   Present hearsay law does not merit a permanent niche in the Constitution; indeed, its ripeness for reform is a unifying theme of evidence literature.   From Bentham to the authors of the Uniform

This case does not involve evidence in any sense "crucial" or "devastating," as did all the cases just discussed. It does not involve the use, or misuse, of a confession made in the coercive atmosphere of official interrogation, as did *Douglas, Brookhart, Bruton,* and *Roberts.* It does not involve any suggestion of prosecutorial misconduct or even negligence, as did *Pointer, Douglas,* and *Barber.* It does not involve the use by the prosecution of a paper transcript, as did *Pointer, Brookhart,* and *Barber.* It does not involve a joint trial, as did *Bruton* and *Roberts.* And it certainly does not involve the wholesale denial of cross-examination, as did *Brookhart.*

In the trial of this case no less than 20 witnesses appeared and testified for the prosecution. Evans' counsel was given full opportunity to cross-examine every one of them. The most important witness, by far, was the eyewitness who described all the details of the triple murder and who was cross-examined at great length. Of the 19 other witnesses, the testimony of but a single one is at issue here. That one witness testified to a brief conversation about Evans he had had with a fellow prisoner in the Atlanta Penitentiary. The witness was vigorously and effectively cross-examined by defense counsel.[18] His testimony, which was of peripheral significance at most, was admitted in evidence under a coconspirator exception to the hearsay rule long established under state statutory law. The Georgia statute can

---

Rules of Evidence, authorities have agreed that present hearsay law keeps reliable evidence from the courtroom. If *Pointer* has read into the Constitution a hearsay rule of unknown proportions, reformers must grapple not only with centuries of inertia but with a constitutional prohibition as well." *Id.,* at 1436. (Footnotes omitted.)

[18] This cross-examination was such as to cast serious doubt on Shaw's credibility and, more particularly, on whether the conversation which Shaw related ever took place.

obviously have many applications consistent with the Confrontation Clause, and we conclude that its application in the circumstances of this case did not violate the Constitution.

Evans was not deprived of any right of confrontation on the issue of whether Williams actually made the statement related by Shaw. Neither a hearsay nor a confrontation question would arise had Shaw's testimony been used to prove merely that the statement had been made. The hearsay rule does not prevent a witness from testifying as to what he has heard; it is rather a restriction on the proof of fact through extrajudicial statements. From the viewpoint of the Confrontation Clause, a witness under oath, subject to cross-examination, and whose demeanor can be observed by the trier of fact, is a reliable informant not only as to what he has seen but also as to what he has heard.[19]

The confrontation issue arises because the jury was being invited to infer that Williams had implicitly identified Evans as the perpetrator of the murder when he blamed Evans for his predicament. But we conclude that there was no denial of the right of confrontation as to this question of identity. First, the statement contained no express assertion about past fact, and consequently it carried on its face a warning to the jury against giving the statement undue weight. Second, Williams' personal knowledge of the identity and role of the other participants in the triple murder is abundantly established by Truett's testimony and by Williams' prior conviction. It is inconceivable that cross-examination could have shown that Williams was not in a position to know

---

[19] Of course Evans had the right to subpoena witnesses, including Williams, whose testimony might show that the statement had not been made. Counsel for Evans informed us at oral argument that he could have subpoenaed Williams but had concluded that this course would not be in the best interests of his client.

whether or not Evans was involved in the murder. Third, the possibility that Williams' statement was founded on faulty recollection is remote in the extreme. Fourth, the circumstances under which Williams made the statement were such as to give reason to suppose that Williams did not misrepresent Evans' involvement in the crime. These circumstances go beyond a showing that Williams had no apparent reason to lie to Shaw. His statement was spontaneous, and it was against his penal interest to make it. These are indicia of reliability which have been widely viewed as determinative of whether a statement may be placed before the jury though there is no confrontation of the declarant.

The decisions of this Court make it clear that the mission of the Confrontation Clause is to advance a practical concern for the accuracy of the truth-determining process in criminal trials by assuring that "the trier of fact [has] a satisfactory basis for evaluating the truth of the prior statement." *California* v. *Green,* 399 U. S., at 161. Evans exercised, and exercised effectively, his right to confrontation on the factual question whether Shaw had actually heard Williams make the statement Shaw related. And the possibility that cross-examination of Williams could conceivably have shown the jury that the statement, though made, might have been unreliable was wholly unreal.

Almost 40 years ago, in *Snyder* v. *Massachusetts,* 291 U. S. 97, Mr. Justice Cardozo wrote an opinion for this Court refusing to set aside a state criminal conviction because of the claimed denial of the right of confrontation. The closing words of that opinion are worth repeating here:

"There is danger that the criminal law will be brought into contempt—that discredit will even touch the great immunities assured by the Fourteenth Amendment—if gossamer possibilities of prej-

udice to a defendant are to nullify a sentence pronounced by a court of competent jurisdiction in obedience to local law, and set the guilty free." 291 U. S., at 122.

The judgment of the Court of Appeals is reversed, and the case is remanded to that court for consideration of the other issues presented in this habeas corpus proceeding.[20]

*It is so ordered.*

Mr. Justice Blackmun, whom The Chief Justice joins, concurring.

I join Mr. Justice Stewart's opinion. For me, however, there is an additional reason for the result.

The single sentence attributed in testimony by Shaw to Williams about Evans, and which has prolonged this litigation, was, in my view and in the light of the entire record, harmless error if it was error at all. Furthermore, the claimed circumstances of its utterance are so incredible that the testimony must have hurt, rather than helped, the prosecution's case. On this ground alone, I could be persuaded to reverse and remand.

Shaw testified that Williams made the remark at issue when Shaw "went to his room in the hospital" and asked Williams how he made out at a court hearing on the preceding day. On cross-examination, Shaw stated that he was then in custody at the federal penitentiary in Atlanta; that he worked as a clerk in the prison hospital; that Williams was lying on the bed in his

---

[20] It was conceded at oral argument that the death penalty imposed in this case cannot be carried out, because the jury was qualified under standards violative of *Witherspoon* v. *Illinois,* 391 U. S. 510. The Court of Appeals for the Fifth Circuit has already set aside, under *Witherspoon,* the death sentence imposed upon Venson Williams, Evans' alleged accomplice. See *Williams* v. *Dutton,* 400 F. 2d 797, 804–805.

room and facing the wall; that he, Shaw, was in the hall and not in the room when he spoke with Williams; that the door to the room "was closed"; that he spoke through an opening about 10 inches square; that the opening "has a piece of plate glass, window glass, just ordinary window glass, and a piece of steel mesh"; that this does not impede talking through the door; and that one talks in a normal voice when he talks through that door. Shaw conceded that when he had testified at Williams' earlier trial, he made no reference to the glass in the opening in the door.

Carmen David Mabry, called by the State, testified that he was with the United States Public Health Service and stationed at the Atlanta Penitentiary. He described the opening in the door to Williams' room and said that it contained a glass "and over that is a wire mesh, heavy steel mesh"; that he has "never tried to talk through the door"; that, to his knowledge, he has never heard "other people talking through the door"; that, during his 11 years at the hospital, the glass has not been out of the door; and that the hospital records disclosed that it had not been out.

I am at a loss to understand how any normal jury, as we must assume this one to have been, could be led to believe, let alone be influenced by, this astonishing account by Shaw of his conversation with Williams in a normal voice through a closed hospital room door. I note, also, the Fifth Circuit's description of Shaw's testimony as "somewhat incredible" and as possessing "basic incredibility." 400 F. 2d, at 828 n. 4.

In saying all this, I am fully aware that the Fifth Circuit panel went on to observe, in the footnote just cited, "[W]e are convinced that it cannot be called harmless." And Justice Quillian, in sole dissent on the direct appeal to the Supreme Court of Georgia, stated, "[I]t obviously was prejudicial to the defendant." 222 Ga.

392, 408; 150 S. E. 2d 240, 251. However, neither the Georgia Superior Court judge who tried the case nor the Federal District Judge who held the hearing on Evans' petition for federal habeas concluded that prejudicial error was present. Also, we do not know the attitude of the Georgia Supreme Court majority, for they decided the issue strictly upon the pronounced limits of the long-established Georgia hearsay rule, 222 Ga., at 402; 150 S. E. 2d, at 248, and presumably had no occasion to touch upon any alternative ground such as harmlessness. I usually would refrain from passing upon an issue of this kind adversely to a federal court of appeals, but when the trial judges do not rule, I would suppose that we are as free to draw upon the cold record as is the appellate court.

I add an observation about corroboration. Marion Calvin Perry, another federal prisoner and one who admitted numerous past convictions, including "larceny of automobiles," testified without objection that he had known Williams and Evans for about 10 years, and Truett for about two years; that he spoke with Williams and Evans some 25 or 30 days prior to the murders of the three police officers; that Williams owed him money; that he and Williams talked by telephone "[a]bout me stealing some cars for him"; that Williams told him that "Alex [Evans] would know what kind of car he [Williams] would want"; that a few days later "me and Alex talked about cars and I told him I didn't want to mess with Venson [Williams]"; that Evans said, "if I got any, he said I could get them for him"; that seven or eight days before the murders Williams asked him by telephone whether he, Perry, "still had the Oldsmobile switch"; that the week of the murders he argued with Evans about how much he should receive for each stolen car; that six days after the murders he saw Evans at a filling station; that they talked about the murders; that "I said if I wanted to know who did it, I would see

mine and your friend"; and that Evans "got mad as hell" and "told me if I thought I knowed anything about it to keep my damn mouth shut."

Another witness, Lawrence H. Hartman, testified that his 1963 red Oldsmobile hardtop was stolen from his home in Atlanta the night of April 16, 1964 (the murders took place on the early morning of April 17). He went on to testify that the 1963 Oldsmobile found burning near the scene of the tragedy was his automobile. There is testimony in the record as to the earlier acquisition by Evans and Williams of another wrecked Oldsmobile of like model and color; as to the towing of that damaged car by a wrecker manned by Williams and Evans; and as to the replacement of good tires on a Chevrolet occupied by Williams, Evans, and Truett, with recapped tires then purchased by them.

This record testimony, it seems to me, bears directly and positively on the Williams-Evans-Truett car-stealing conspiracy and accomplishments and provides indisputable confirmation of Evans' role. The requirements of the Georgia corroboration rule were fully satisfied and Shaw's incredible remark fades into practical and legal insignificance.

The error here, if one exists, is harmless beyond a reasonable doubt. *Chapman* v. *California,* 386 U. S. 18, 21–25; *Harrington* v. *California,* 395 U. S. 250.

MR. JUSTICE HARLAN, concurring in the result.

Not surprisingly the difficult constitutional issue presented by this case has produced multiple opinions. MR. JUSTICE STEWART finds Shaw's testimony admissible because it is "wholly unreal" to suggest that cross-examination would have weakened the effect of Williams' statement on the jury's mind. MR. JUSTICE BLACKMUN, while concurring in this view, finds admission of the statement to be harmless, seemingly because he deems Shaw's testimony so obviously fabricated that no normal jury

would have given it credence. MR. JUSTICE MARSHALL answers both suggestions to my satisfaction, but he then adopts a position that I cannot accept. He apparently would prevent the prosecution from introducing any out-of-court statement of an accomplice unless there is an opportunity for cross-examination, and this regardless of the circumstances in which the statement was made and regardless of whether it is even hearsay.

The difficulty of this case arises from the assumption that the core purpose of the Confrontation Clause of the Sixth Amendment is to prevent overly broad exceptions to the hearsay rule. I believe this assumption to be wrong. Contrary to things as they appeared to me last Term when I wrote in *California* v. *Green*, 399 U. S. 149, 172 (1970), I have since become convinced that Wigmore states the correct view when he says:

> "The Constitution does not prescribe what kinds of testimonial statements (dying declarations, or the like) shall be given infra-judicially,—this depends on the law of Evidence for the time being,—but only what mode of procedure shall be followed—*i. e.* a cross-examining procedure—in the case of such testimony as is required by the ordinary law of Evidence to be given infra-judicially." 5 J. Wigmore, Evidence § 1397, at 131 (3d ed. 1940) (footnote omitted).

The conversion of a clause intended to regulate trial procedure into a threat to much of the existing law of evidence and to future developments in that field is not an unnatural shift, for the paradigmatic evil the Confrontation Clause was aimed at—trial by affidavit [1]—can be

---

[1] See *California* v. *Green, supra,* at 179 (concurring opinion): historically, "the Confrontation Clause was meant to constitutionalize a barrier against flagrant abuses, trial by anonymous accusers, and absentee witnesses."

viewed almost equally well as a gross violation of the rule against hearsay and as the giving of evidence by the affiant out of the presence of the accused and not subject to cross-examination by him. But however natural the shift may be, once made it carries the seeds of great mischief for enlightened development in the l w of evidence.

If one were to translate the Confrontation Clause into language in more common use today, it would read: "In all criminal prosecutions, the accused shall enjoy the right to be present and to cross-examine the witnesses against him." Nothing in this language or in its 18th-century equivalent would connote a purpose to control the scope of the rules of evidence. The language is particularly ill-chosen if what was intended was a prohibition on the use of any hearsay—the position toward which my Brother MARSHALL is being driven, although he does not quite yet embrace it.

Nor am I now content with the position I took in concurrence in California v. Green, supra, that the Confrontation Clause was designed to establish a preferential rule, requiring the prosecutor to avoid the use of hearsay where it is reasonably possible for him to do so—in other words, to produce available witnesses. Further consideration in the light of facts squarely presenting the issue, as Green did not, has led me to conclude that this is not a happy intent to be attributed to the Framers absent compelling linguistic or historical evidence pointing in that direction. It is common ground that the historical understanding of the clause furnishes no solid guide to adjudication.[2]

A rule requiring production of available witnesses would significantly curtail development of the law of

---

[2] See id., at 175–179, especially 176 n. 8 (concurring opinion).

evidence to eliminate the necessity for production of declarants where production would be unduly inconvenient and of small utility to a defendant. Examples which come to mind are the Business Records Act, 28 U. S. C. §§ 1732–1733, and the exceptions to the hearsay rule for official statements, learned treatises, and trade reports. See, *e. g.,* Uniform Rules of Evidence 63 (15), 63 (30), 63 (31); *Gilstrap* v. *United States,* 389 F. 2d 6 (CA5 1968) (business records); *Kay* v. *United States,* 255 F. 2d 476 (CA4 1958) (laboratory analysis). If the hearsay exception involved in a given case is such as to commend itself to reasonable men, production of the declarant is likely to be difficult, unavailing, or pointless. In unusual cases, of which the case at hand may be an example, the Sixth Amendment guarantees federal defendants the right of compulsory process to obtain the presence of witnesses, and in *Washington* v. *Texas,* 388 U. S. 14 (1967), this Court held that the Fourteenth Amendment extends the same protection to state defendants.[3]

Regardless of the interpretation one puts on the words of the Confrontation Clause, the clause is simply not well designed for taking into account the numerous factors that must be weighed in passing on the appropriateness of rules of evidence. The failure of MR. JUSTICE STEWART's opinion to explain the standard by which it tests Shaw's statement, or how this standard can be squared with the seemingly absolute command of the clause, bears witness to the fact that the clause is being set a task for which it is not suited. The task is far more appropriately performed under the aegis of the Fifth and

---

[3] Although the fact is not necessary to my conclusion, I note that counsel for Evans conceded at oral argument that he could have secured Williams' presence to testify, but decided against it. Tr. of Oral Arg. 51, 55.

Fourteenth Amendments' commands that federal and state trials, respectively, must be conducted in accordance with due process of law. It is by this standard that I would test federal and state rules of evidence.[4]

It must be recognized that not everything which has been said in this Court's cases is consistent with this position. However, this approach is not necessarily inconsistent with the results that have been reached. Of the major "confrontation" decisions of this Court, seven involved the use of prior-recorded testimony.[5] In the absence of countervailing circumstances, introduction of such evidence would be an affront to the core meaning of the Confrontation Clause. The question in each case, therefore, was whether there had been adequate "confrontation" to satisfy the requirement of the clause. Regardless of the correctness of the results, the holding that the clause was applicable in those situations is consistent with the view of the clause I have taken.

Passing on to the other principal cases, *Dowdell* v. *United States,* 221 U. S. 325, 330 (1911), held that the Confrontation Clause did not prohibit the introduction of "[d]ocumentary evidence to establish collateral facts,

---

[4] Reliance on the Due Process Clauses would also have the virtue of subjecting rules of evidence to constitutional scrutiny in civil and criminal trials alike. It is exceedingly rare for the common law to make admissibility of evidence turn on whether the proceeding is civil or criminal in nature. See 1 Wigmore, *supra,* § 4, at 16–17. This feature of our jurisprudence is a further indication that the Confrontation Clause, which applies only to criminal prosecutions, was never intended as a constitutional standard for testing rules of evidence.

[5] *Reynolds* v. *United States,* 98 U. S. 145 (1879); *Mattox* v. *United States,* 156 U. S. 237 (1895); *Motes* v. *United States,* 178 U. S. 458 (1900); *West* v. *Louisiana,* 194 U. S. 258 (1904); *Pointer* v. *Texas,* 380 U. S. 400 (1965); *Barber* v. *Page,* 390 U. S. 719 (1968); *California* v. *Green,* 399 U. S. 149 (1970).

admissible under the common law." While this was characterized as an exception to the clause, rather than a problem to which the clause did not speak, the result would seem correct. *Brookhart* v. *Janis,* 384 U. S. 1 (1966), and *Smith* v. *Illinois,* 390 U. S. 129 (1968), involved restrictions on the right to cross-examination or the wholesale denial of that right. *Douglas* v. *Alabama,* 380 U. S. 415 (1965), is perhaps most easily dealt with by viewing it as a case of prosecutorial misconduct. Alternatively, I would be prepared to hold as a matter of due process that a confession of an accomplice resulting from formal police interrogation cannot be introduced as evidence of the guilt of an accused, absent some circumstance indicating authorization or adoption. The exclusion of such evidence dates at least from *Tong's Case,* Kelyng 17, 18–19, 84 Eng. Rep. 1061, 1062 (K. B. 1663), and is universally accepted. This theory would be adequate to account for the results of both *Douglas* and *Bruton* v. *United States,* 391 U. S. 123 (1968).

The remaining confrontation case of significance is *Kirby* v. *United States,* 174 U. S. 47 (1899). In that case a record of conviction of three men for theft was introduced at Kirby's trial. The judge instructed the jury that this judgment was prima facie evidence that the goods which Kirby was accused of receiving from the three men were in fact stolen. This Court reversed, holding that since the judgment was the sole evidence of the fact of theft, Kirby had been denied his right of confrontation. In my view this is not a confrontation case at all, but a matter of the substantive law of judgments. Accord, 4 Wigmore, *supra,* § 1079, at 133. Indeed, the *Kirby* Court indicated that lack of confrontation was not at the heart of its objection when it said

that the record would have been competent evidence of the fact of conviction. The correctness of the result in *Kirby* can hardly be doubted, but it was, I think, based on the wrong legal theory.

Judging the Georgia statute here challenged by the standards of due process, I conclude that it must be sustained. Accomplishment of the main object of a conspiracy will seldom terminate the community of interest of the conspirators. Declarations against that interest evince some likelihood of trustworthiness. The jury, with the guidance of defense counsel, should be alert to the obvious dangers of crediting such testimony. As a practical matter, unless the out-of-court declaration can be proved by hearsay evidence, the facts it reveals are likely to remain hidden from the jury by the declarant's invocation of the privilege against self-incrimination.[6] In light of such considerations, a person weighing the necessity for hearsay evidence of the type here involved against the danger that a jury will give it undue credit might reasonably conclude that admission of the evidence would increase the likelihood of just determinations of truth. Appellee has not suggested that Shaw's testimony possessed any peculiar characteristic that would lessen the force of these general considerations and require, as a constitutional matter, that the trial judge exercise residual discretion to exclude the evidence as unduly in-

---

[6] Quite apart from *Malloy* v. *Hogan,* 378 U. S. 1 (1964), Georgia has long recognized the privilege. The Georgia Constitution of 1877, Art. I, § 1, ¶ VI, provided that: "No person shall be compelled to give testimony tending in any manner to criminate himself," and the same language appears in the present state constitution. Ga. Const. of 1945, Art. I, § 1, ¶ VI. The right had previously been recognized as a matter of common law, even in civil trials. See, *e. g., Marshall* v. *Riley,* 7 Ga. 367 (1849).

100

flammatory. Exclusion of such statements, as is done in the federal courts, commends itself to me, but I cannot say that it is essential to a fair trial. The Due Process Clause requires no more.

On the premises discussed in this opinion, I concur in the reversal of the judgment below.

MR. JUSTICE MARSHALL, whom MR. JUSTICE BLACK, MR. JUSTICE DOUGLAS, and MR. JUSTICE BRENNAN join, dissenting:

Appellee Evans was convicted of first-degree murder after a trial in which a witness named Shaw was allowed to testify, over counsel's strenuous objection, about a statement he claimed was made to him by Williams, an alleged accomplice who had already been convicted in a separate trial.[1] According to Shaw, the statement, which implicated both Williams and Evans in the crime, was made in a prison conversation immediately after Williams' arraignment. Williams did not testify nor was he called as a witness. Nevertheless, the Court today concludes that admission of the extrajudicial statement attributed to an alleged partner in crime did not deny Evans the right "to be confronted with the witnesses against him" guaranteed by the Sixth and Fourteenth Amendments to the Constitution. In so doing, the majority reaches a result completely inconsistent with recent opinions of this Court, especially *Douglas* v. *Alabama*, 380 U. S. 415 (1965), and *Bruton* v. *United States*, 391 U. S. 123 (1968). In my view, those cases fully apply here and establish a clear violation of Evans' constitutional rights.

---

[1] Shaw had been a witness at Williams' trial; his testimony was fully anticipated and was objected to both before and after its admission.

In *Pointer* v. *Texas,* 380 U. S. 400 (1965), this Court first held that "the Sixth Amendment's right of an accused to confront the witnesses against him is . . . a fundamental right and is made obligatory on the States by the Fourteenth Amendment." *Id.,* at 403. That decision held constitutionally inadmissible a statement offered against a defendant at a state trial where the statement was originally made at a preliminary hearing under circumstances not affording the defendant an adequate opportunity for cross-examination. Indeed, we have since held that even cross-examination at a prior hearing does not satisfy the confrontation requirement, at least where the witness who made the statement is available to be called at trial. *Barber* v. *Page,* 390 U. S. 719 (1968). "The right to confrontation is basically a trial right. It includes both the opportunity to cross-examine and the occasion for the jury to weigh the demeanor of the witness." *Id.,* at 725.

In *Douglas* v. *Alabama, supra,* this Court applied the principles of *Pointer* to a case strikingly similar to this one. There, as here, the State charged two defendants with a crime and tried them in separate trials. There, as here, the State first prosecuted one defendant (Loyd) and then used a statement by him in the trial of the second defendant (Douglas). Although the State called Loyd as a witness, an appeal from his conviction was pending and he refused to testify on the ground that doing so would violate his Fifth Amendment privilege against self-incrimination.

Without reaching the question whether the privilege was properly invoked,[2] the Court held that the prosecu-

---

[2] This same question—which presents a fundamental conflict between a defendant's Sixth Amendment rights and a witness' Fifth Amendment privilege—might have been present here had the State

tor's reading of Loyd's statement in a purported attempt to refresh his memory denied Douglas' right to confrontation. "Loyd could not be cross-examined on a statement imputed to but not admitted by him." 380 U. S., at 419. Of course, Douglas was provided the opportunity to cross-examine the officers who testified regarding Loyd's statement. "But since their evidence tended to show only that Loyd made the confession, cross-examination of them . . . could not substitute for cross-examination of Loyd to test the truth of the statement itself." [3] *Id.*, at 420. Surely, the same reasoning compels the exclusion of Shaw's testimony here. Indeed, the only significant difference between *Douglas* and this case, insofar as the denial of the opportunity to cross-examine is concerned, is that here the State did not even attempt to call Williams to testify in Evans' trial. He was plainly available to the State, and for all we know he would have willingly testified, at least with regard to his alleged conversation with Shaw.[4]

Finally, we have applied the reasoning of *Douglas* to hold that, "despite instructions to the jury to disregard

called Williams to testify. Under a view that would make availability of a declarant the only concern of confrontation, see *California* v. *Green,* 399 U. S. 149, 172–189 (1970) (HARLAN, J., concurring), the State's right or duty to compel a codefendant's testimony, by timing of trials and use of testimonial immunity, wou'' seemingly have to be decided. See Comment, Exercise of the Privilege Against Self-Incrimination by Witnesses and Codefendants: The Effect Upon the Accused, 33 U. Chi. L. Rev. 151, 165 (1965).

[3] *Cf. Brookhart* v. *Janis,* 384 U. S. 1, 4 (1966).

[4] My Brother STEWART comments that Evans might have brought Williams to the courthouse by subpoena. Defense counsel did not do so, believing that Williams would stand on his right not to incriminate himself. Tr. of Oral Arg. 55. Be that as it may, it remains that the duty to confront a criminal defendant with the witnesses against him falls upon the *State,* and here the State was allowed to introduce damaging evidence without running the risks of trial confrontation. Cf. n. 2, *supra.*

the implicating statements in determining the codefendant's guilt or innocence, admission at a joint trial of a defendant's extrajudicial confession implicating a codefendant violated the codefendant's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment." *Roberts* v. *Russell,* 392 U. S. 293 (1968), giving retroactive effect in both state and federal trials to *Bruton* v. *United States,* 391 U. S. 123 (1968). Thus Williams' alleged statement, an extrajudicial admission made to a fellow prisoner, could not even have been introduced against Williams if he had been tried in a joint trial with Evans.

The teaching of this line of cases seems clear: Absent the opportunity for cross-examination, testimony about the incriminating and implicating statement allegedly made by Williams was constitutionally inadmissible in the trial of Evans.

MR. JUSTICE STEWART'S opinion for reversal characterizes as "wholly unreal" the possibility that cross-examination of Williams himself would change the picture presented by Shaw's account. A trial lawyer might well doubt, as an article of the skeptical faith of that profession, such a categorical prophecy about the likely results of careful cross-examination. Indeed, the facts of this case clearly demonstrate the necessity for fuller factual development which the corrective test of cross-examination makes possible. The plurality for reversal pigeonholes the out-of-court statement that was admitted in evidence as a "spontaneous" utterance, hence to be believed. As the Court of Appeals concluded, however, there is great doubt that Williams even made the statement attributed to him.[5] More-

---

[5] After considering Shaw's testimony and other evidence submitted at the trial, the Court of Appeals concluded that Shaw's account of his conversation with Williams was notable for "its basic incredibility." 400 F. 2d 826, 828 n. 4.

over, there remains the further question what, if anything, Williams might have meant by the remark that Shaw recounted. MR. JUSTICE STEWART's opinion con-· cedes that the remark is ambiguous. Plainly it stands as an accusation of some sort: "If it hadn't been for . . . Evans," said Williams, according to Shaw, "we wouldn't be in this now." At his trial Evans himself gave unsworn testimony to the effect that the murder prosecution might have arisen from enmities that Evans' own law enforcement activities had stirred up in the locality. Did Williams' accusation relate to Evans as a man. with powerful and unscrupulous enemies, or Evans as a murderer? MR. JUSTICE STEWART's opinion opts for the latter interpretation, for it concludes that Williams' remark was "against his penal interest" and hence to be believed. But at this great distance from events, no one· can be certain. The point is that absent cross-examination of Williams himself, the jury was left with only the unelucidated, apparently damning, and patently damaging accusation as told by Shaw.

Thus we have a case with all the unanswered questions that the confrontation of witnesses through cross-examination is meant to aid in answering: What did the declarant say, and what did he mean, and was it the truth? If Williams had testified and been cross-examined, Evans' counsel could have fully explored these and other matters. The jury then could have evaluated the statement in the light of Williams' testimony and demeanor. As it was, however, the State was able to use Shaw to present the damaging evidence and thus to avoid confronting Evans with the person who allegedly gave witness against him. I had thought that this was precisely what the Confrontation Clause as applied to the States in *Pointer* and our other cases prevented.

Although MR. JUSTICE STEWART's opinion for reversal concludes that there was no violation of Evans' right of

confrontation, it does so in the complete absence of authority or reasoning to explain that result. For example, such facts as that Williams' alleged statement was not made during official interrogation, was not in transcript form, and was not introduced in a joint trial—though they differentiate some of the cases—are surely irrelevant. Other cases have presented each of these factors,[6] and no reason is offered why the right of confrontation could be so limited.

Nor can it be enough that the statement was admitted in evidence "under a long-established and well-recognized rule of state law." MR. JUSTICE STEWART'S opinion surely does not mean that a defendant's constitutional right of confrontation must give way to a state evidentiary rule. That much is established by our decision in *Barber* v. *Page, supra,* which held unconstitutional the admission of testimony in accordance with a rule similarly well recognized and long established. However, the plurality for reversal neither succeeds in distinguishing that case nor considers generally that there are inevitably conflicts between *Pointer* and state evidentiary rules. Rather, it attempts to buttress its conclusion merely by announcing a reluctance to equate evidentiary hearsay rules and the Confrontation Clause.[7]

---

[6] For example, *Pointer* involved only the second, and that one was not present in either *Bruton* or *Roberts.*

[7] Constitutionalization of "all common-law hearsay rules and their exceptions," *California* v. *Green,* 399 U. S., at 174 (concurring opinion), would seem to be a prospect more frightening than real. Much of the complexity afflicting hearsay rules comes from the definition of hearsay as an out-of-court statement presented for the truth of the matter stated—a definition nowhere adopted by this Court for confrontation purposes. Rather, the decisions, while looking to availability of a declarant, *Barber* v. *Page, supra,* recognize that "cross-examination is included in the right of an accused in a criminal case to confront the witnesses against him," *Pointer* v. *Texas,* 380 U. S., at 404, and that admission in the absence of cross-

The Court of Appeals, however, was not of the view that the Confrontation Clause implies unrelenting hostility to whatever evidence may be classified as hearsay. Nor did that court hold that States must conform their evidentiary rules to the hearsay exceptions applicable in federal conspiracy trials. While it did note that this case does not in reality even involve the traditional hearsay rule and its so-called coconspirators exception,[8] that was not the basis for its decision. Rather, the Court of Appeals found in the admission of an incriminatory and inculpating statement attributed to an alleged accomplice who was not made available for cross-examination what it termed an obvious abridgment of Evans' right of confrontation. Since the State presented no satisfactory justification for the denial of confrontation, cf. *Pointer* v. *Texas,* 380 U. S., at 407, the Court of Appeals

---

examination of certain types of suspect and highly damaging statements is one of the "threats to a fair trial" against which "the Confrontation Clause was directed," *Bruton* v. *United States,* 391 U. S., at 136.

[8] Evans was not charged with conspiracy nor could he have been under Georgia law. The "conspiracy" element came in as part of the State's evidentiary law, part of which goes far beyond the traditional hearsay exception even as it exists with regard to the "concealment phase" in some jurisdictions. Indeed, Williams' alleged statement itself negates the notion that Evans had authorized Williams to speak or had assumed the risk in order to achieve an unlawful aim through concert of effort. It is difficult to conceive how Williams could be part of a conspiracy to conceal the crime when all the alleged participants were in custody and he himself had already been arraigned. As this Court stated in *Fiswick* v. *United States,* 329 U. S. 211, 217 (1946), an "admission by one co-conspirator after he has been apprehended is not in any sense a furtherance of the criminal enterprise. It is rather a frustration of it." One lower court in Georgia has adopted essentially this reasoning in reversing a conviction where testimony similar to that objected to in this case was admitted. See *Green* v. *State,* 115 Ga. App. 685, 155 S. E. 2d 655 (1967). But see n. 9, *infra.*

held that under *Douglas* v. *Alabama* and this Court's other cases Evans was denied his constitutional rights.

Surely the Constitution requires at least that much when the State denies a defendant the right to confront and cross-examine the witnesses against him in a criminal trial. In any case, that Shaw's testimony was admitted in accordance with an established rule of state law cannot aid my Brethren in reaching their conclusion. Carried to its logical end, justification of a denial of the right of confrontation on that basis would provide for the wholesale avoidance of this Court's decisions in *Douglas* and *Bruton*,[9] decisions which MR. JUSTICE STEWART's opinion itself reaffirms. Indeed, if that opinion meant what it says, it would come very close to establishing in reverse the very equation it seeks to avoid—an equation that would give any exception to a state hearsay rule a "permanent niche in the Constitution" in the form of an exception to the Confrontation Clause as well.

Finally, the plurality for reversal apparently distinguishes the present case on the ground that it "does not involve evidence in any sense 'crucial' or 'devastating.'"

---

[9] The Georgia rule involved here, which apparently makes admissible all pre-trial statements and admissions of an alleged accomplice or coconspirator, inevitably conflicts with this Court's decisions regarding the Confrontation Clause. See *Darden* v. *State,* 172 Ga. 590, 158 S. E. 414 (1931), and *Mitchell* v. *State,* 86 Ga. App. 292, 71 S. E. 2d 756 (1952), where confessions of codefendants not on trial were held admissible. Indeed, the Georgia Supreme Court seems to have resolved this conflict in favor of the state rule by erroneously concluding that this Court's decisions are based on the federal hearsay rule concerning "a confession by one of the coconspirators after he has been apprehended." *Pinion* v. *State,* 225 Ga. 36, 37, 165 S. E. 2d 708, 709–710 (1969). See also *Park* v. *State,* 225 Ga. 618, 170 S. E. 2d 687 (1969), petition for cert. filed, November 4, 1969, No. 57, O. T. 1970 (renumbered).

108

Despite the characterization of Shaw's testimony as "of peripheral significance at most," however, the possibility of its prejudice to Evans was very real.  The outcome of Evans' trial rested, in essence, on whether the jury would believe the testimony of Truett with regard to Evans' role in the murder.  Truett spoke as an admitted accomplice who had been immunized from prosecution.  Relying on Georgia law, not federal constitutional law, the trial judge instructed the jury that "you cannot lawfully convict upon the testimony of an accomplice alone. . . . [T]he testimony of an accomplice must be corroborated . . . .  [T]he corroboration . . . must be such as to connect the defendant with the criminal act."  The State presented the testimony of a number of other witnesses, in addition to that of the alleged accomplice that tended to corroborate Evans' guilt.  But Shaw's account of what Williams supposedly said to him was undoubtedly a part of that corroborating evidence.[10]

---

[10] The trial judge's instructions left no doubt that the statement attributed to Williams could provide the necessary corroboration. See Trial Record 412–413.  Indeed, the prejudicial impact of Shaw's testimony is graphically revealed simply by juxtaposing two quotations.  First, there is characterization in MR. JUSTICE STEWART's opinion of Shaw's testimony, a characterization that I find fair albeit studiedly mild: "[T]he jury was being invited to infer that Williams had implicitly *identified Evans as the perpetrator* of the murder. . . ."  (Emphasis added.)  Second, there is the trial judge's charge on corroboration of accomplice testimony: *"Slight evidence* from an extraneous source *identifying the accused as a participator in the criminal act* will be sufficient corroboration of an accomplice to support a verdict."  (Emphasis added.)  In the light of the charge and on consideration of the whole record of Evans' trial, it is impossible for me to believe "beyond a reasonable doubt" that the error complained of did not contribute to the verdict obtained. *Chapman* v. *California,* 386 U. S. 18, 24 (1967); *Harrington* v. *California,* 395 U. S. 250, 251 (1969).

Indeed, MR. JUSTICE STEWART'S opinion does not itself upset the Court of Appeals' finding that the admission of Shaw's testimony, if erroneous, could not be considered harmless. Beyond and apart from the question of harmless error, MR. JUSTICE STEWART undertakes an inquiry, the purpose of which I do not understand, into whether the evidence admitted is "crucial" or "devastating." The view is, apparently, that to require the exclusion of evidence falling short of that high standard of prejudice would bring a moment of clamor against the Bill of Rights. I would eschew such worries and confine the inquiry to the traditional questions: Was the defendant afforded the right to confront the witnesses against him? And, if not, was the denial of his constitutional right harmless beyond a reasonable doubt?

The fact is that Evans may well have been convicted in part by an incriminatory and implicating statement attributed to an alleged accomplice who did not testify and who consequently could not be questioned regarding the truth or meaning of that statement. The Court of Appeals correctly recognized that the Confrontation Clause prohibits such a result, whether the statement is introduced under the guise of refreshing a witness' recollection as in *Douglas* v. *Alabama,* against a codefendant with a limiting instruction as in *Bruton* v. *United States,* or in accordance with some other evidentiary rule as here.

I am troubled by the fact that the plurality for reversal, unable when all is said to place this case beyond the principled reach of our prior decisions, shifts its ground and begins a hunt for whatever "indicia of reliability" may cling to Williams' remark, as told by Shaw. Whether Williams made a "spontaneous" statement "against his penal interest" is the very question that should have been tested by cross-examination of Williams

himself. If "indicia of reliability" are so easy to come by, and prove so much, then it is only reasonable to ask whether the Confrontation Clause has any independent vitality at all in protecting a criminal defendant against the use of extrajudicial statements not subject to cross-examination and not exposed to a jury assessment of the declarant's demeanor at trial.[11] I believe the Confrontation Clause has been sunk if any out-of-court statement bearing an indicium of a probative likelihood can come in, no matter how damaging the statement may be or how great the need for the truth-discovering test of cross-examination. Cf. *California* v. *Green,* 399 U. S. 149, 161–162 (1970). Our decisions from *Pointer* and *Douglas* to *Bruton* and *Roberts* require more than this meager inquiry. Nor is the lame "indicia" approach necessary to avoid a rampaging Confrontation Clause that tramples all flexibility and innovation in a state's law of evidence. That specter is only a specter.[12] To decide this case I need. not go beyond hitherto settled Sixth and Fourteenth Amendment law to consider generally what effect, if any, the Confrontation Clause has on the common-law hearsay rule and its exceptions, since no issue of such global dimension is presented. Cf. *Bruton* v. *United States,* 391 U. S., at 128 n. 3. The incriminatory extrajudicial statement of an alleged accomplice is so inherently prejudicial that it cannot be introduced unless there is an opportunity to cross-examine the declarant, whether or not his state-

---

[11] MR. JUSTICE HARLAN answers this question with directness by adopting, to decide this case, his view of due process which apparently makes no distinction between civil and criminal trials, and which would prohibit only irrational or unreasonable evidentiary rulings. Needless to say, I cannot accept the view that Evans' constitutional rights should be measured by a standard concededly having nothing to do with the Confrontation Clause.

[12] See n. 7, *supra.*

ment falls within a genuine exception to the hearsay rule.

In my view, Evans is entitled to a trial in which he is fully accorded his constitutional guarantee of the right to confront and cross-examine all the witnesses against him. I would affirm the judgment of the Court of Appeals and let this case go back to the Georgia courts to be tried without the use of this out-of-court statement attributed by Shaw to Williams.