TRAP ROCK INDUSTRIES, INC., A NEW JERSEY CORPORA-
TION, RESPONDENT, v. JOHN C. KOHL, COMMISSIONER
OF TRANSPORTATION, AND JAMES R. SCHUYLER,
STATE HIGHWAY ENGINEER, APPELLANTS.

CARMEN OTTILIO, t/a V. OTTILIO AND SONS, RESPON-
DENT, v. JOHN C. KOHL, COMMISSIONER OF TRANS-
PORTATION, APPELLANT.

Argued September 27, 1971—Decided November 23, 1971.

472

474

Mr. *George F. Kugler, Jr.,* Attorney General of New Jersey, argued the cause for appellants (*Mr. Stephen Skillman,* Assistant Attorney General, and *Mr. David A. Biederman,* Deputy Attorney General, of counsel; *Messrs. Alfred L. Nardelli, Roger L. Hillman,* and *Courtland T. Babcock, II,* Deputy Attorneys General, on the brief).

Mr. *Justin P. Walder* argued the cause on behalf of respondent Trap Rock Industries, Inc. (*Mr. Jeffrey Barton Cahn,* on the brief; *Messrs. Schapira, Steiner and Walder,* attorneys).

Mr. *Louis Santorf* argued the cause for respondent Ottilio (*Messrs. Kopp, Knoepfel and Toomey,* on the brief).

Mr. *Theodore W. Geiser* argued on behalf of *amicus curiae* New Jersey Heavy, Highway and Construction Industry Advancement Fund (*Mr. Richard D. Catenacci,* on the brief;

*Messrs. Hughes, McElroy, Connell, Foley and Geiser,* attorneys).

The opinion of the Court was delivered by

WEINTRAUB, C. J. The issue before us is whether the State Commissioner of Transportation (herein Commissioner) improperly "suspended" the respondents (herein contractors) from bidding on contracts to be awarded by the Department of Transportation, a principal department of the executive branch of the State government. Both contractors had been "classified" to bid. As will presently appear, a statute provides that prospective bidders shall establish their qualifications prior to bidding rather than after the bids have been received and the low bidder ascertained. In the cases before us, the suspension was based upon the fact that indictments had been returned charging criminal offenses, without proof before the Commissioner affirmatively establishing the criminal allegations. In both cases the contractors declined an opportunity to present evidence concerning the truth of the criminal charges. The Appellate Division held the suspensions were illegal because of the absence of competent evidence establishing the commission of the alleged offenses. *Trap Rock Industries, Inc. v. Kohl,* 115 *N. J. Super.* 278 (App. Div. 1971) ; *Ottilio v. Kohl* (not reported). We granted the Commissioner's petitions for certification. 59 *N. J.* 239 (1971).

As to respondent Trap Rock Industries (herein Trap Rock), the indictment ran against Michael J. Stavola. He owns 80% of the stock of Trap Rock and is its president and chairman of its board of directors. The indictment charged that Stavola conspired with another to bribe and offered a bribe of $5,000 to a member of the New Jersey State Police to intercede improperly on Stavola's behalf with respect to still another indictment charging Stavola with assault and battery upon a police officer and with obstructing the officer in the performance of his duties. Upon learning of the bribery indictment, the Commissioner gave

notice to Trap Rock that this criminal charge would, in the Commissioner's opinion, affect the "responsibility" of Trap Rock; that Trap Rock's "classification" was thereby "suspended"; and that Trap Rock was given "an opportunity to be heard on this action" within the ensuing ten days. At the hearing the indictment was placed in evidence. Trap Rock noted Stavola's plea of not guilty to the indictment but declined to offer any testimony as to the criminal charges. Trap Rock also declined to consent to the examination of the transcript of the grand jury testimony.

Prior to the Commissioner's action, Trap Rock had bid on a job. Subsequently it developed that Trap Rock was the low bidder for that contract. The Commissioner refused to award the contract to Trap Rock. The Appellate Division's judgment would have required the award to be made to Trap Rock. We granted a stay of an award pending the disposition of this appeal.

Respondent Carmen Ottilio is the sole owner of the business he conducts under a trade name, V. Ottilio and Sons. The indictment in his case was returned in the United States District Court for the District of New Jersey. Nine counts charged Ottilio with offering substantial bribes to a special agent of the Intelligence Division, United States Internal Revenue Service, and also with filing false income tax returns, again involving substantial sums of money. As in the case of Trap Rock, the Commissioner notified Ottilio that there were developments since his classification to bid which would affect Ottilio's responsibility and would authorize the voiding of such classification; that his classification was "suspended," and that an opportunity would be afforded him to be heard on that action. Again, as in the case of Trap Rock, the indictment was introduced into evidence and Ottilio declined to go beyond noting his plea of not guilty in the federal court. Ottilio waived any objection to the Commissioner's examination of the grand jury minutes, but, we gather, the federal authorities would not make them available.

The contractors contend the Commissioner's actions violate the provisions of the Administrative Procedure Act and deny due process because (1) the Commissioner did not adopt rules delineating the misdeeds which would disqualify a bidder, and (2) their classifications were suspended on the basis of an indictment alone, without independent proof of the truth of the criminal charges.

I

These cases do not involve the right to engage in business. The contractors are free to do business with anyone willing to deal with them. The question is whether the State must do business with them despite the Commissioner's view that the public interest would be disserved by doing so. And the question is not whether the Commissioner may bar Trap Rock or Ottilio permanently upon the record in these matters, for the Commissioner went no further than temporarily to suspend their opportunity to seek the business of the Department of Transportation pending a showing that the State's interest would be served by doing business with them notwithstanding the criminal charges.

We start with the premise expressed in *Perkins v. Lukens Steel Co.*, 310 *U. S.* 113, 127, 60 S. Ct. 869, 84 *L. Ed.* 1108, 1114–1115 (1940), that "Like private individuals and businesses, the Government enjoys the unrestricted power to produce its own supplies, to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases." The State need not resort to competitive bidding. *Cf. Lehigh Construction Co. v. Housing Authority of the City of Orange,* 56 *N. J.* 447 (1970) ; *Rutgers, the State University v. Kugler,* 110 *N. J. Super.* 424 (Law Div. 1970), affirmed o. b., 58 *N. J.* 113 (1971). And if the Legislature chooses to direct competitive bidding, it need not mandate an award to the "lowest" responsible bidder but rather may vest in its agent the discretion to accept the bid of "that responsible bidder whose bid, conforming to

the invitation for bids, will be most advantageous to the State, price and other factors considered," as the statute provided in *Commercial Cleaning Corp. v. Sullivan,* 47 *N. J.* 539, 548 (1966).

That the State may decide how to procure its needs does not mean that, having chosen a course, the State may pursue it with the abandon of a private consumer. When the State acts, certain restraints attach. So, as frequently noted, the State could not select its suppliers on the basis of religious, racial or ethnic attributes. See *Garden State Dairies of Vineland, Inc. v. Sills,* 46 *N. J.* 349, 355 (1966), same case, 53 *N. J.* 71 (1968); *cf. Burlington County Evergreen Park Mental Hospital v. Cooper,* 56 *N. J.* 579, 583–584 (1970). Nonetheless the purpose of a procurement program is not to advance the interest of those who want the State's business. On the contrary, the purpose is to serve the State's interest as purchaser.

The purpose of competitive bidding statutes "is to secure competition and to guard against favoritism, improvidence, extravagance and corruption. Statutes directed toward these ends are for the benefit of the taxpayers and not the bidders; they should be construed with sole reference to the public good * * *." *Hillside Township, Union County v. Sternin,* 25 *N. J.* 317, 322 (1957).

▮ It, of course, serves the public interest to permit suits to enforce the policy of these statutes. To that end, a taxpayer may sue. So, too, may a bidder who claims to be entitled to the award. And to the same end, the low bidder is entitled to be heard by the public authority before his bid is rejected. *Commercial Cleaning Corp. v. Sullivan, supra,* 47 *N. J.* at 550; *Arthur Venneri Co. v. Paterson Housing Authority,* 29 *N. J.* 392, 402 (1959); *Paterson Contracting Co. v. Hackensack,* 99 *N. J. L.* 260, 261 (E. & A. 1923); *J. Turco Paving Contractor, Inc. v. City Council of Orange,* 89 *N. J. Super.* 93, 98–99 (App. Div. 1965); *Sellitto v. Cedar Grove,* 132 *N. J. L.* 29, 32 (Sup. Ct. 1944). The low bidder is sometimes said to have acquired a "status."

That he has an interest of some character which will support a claim to be heard cannot be questioned. The point to be stressed is that the interest, whatever its dimensions, is conferred upon him to the end that the public will obtain all that is due it in the procurement process, rather than for his individual aggrandizement. As was said in *Arthur Venneri Co., supra,* 29 *N. J.* at 402–03, "The requirement of a hearing derives from the basic policy of the bidding laws, *i. e.,* the encouragement of competition, which in turn works to protect the public coffers and prevent chicanery and fraud in public office."

We noted earlier that Trap Rock and Ottilio were "prequalified" for bidding. Under some competitive bidding statutes, the bidder's qualifications are determined after bids are received and the low bidder thus ascertained. There are, however, some situations in which the Legislature has decided that the public interest would be furthered by classifying prospective bidders in advance of bidding. One such statute, *N. J. S. A.* 27:7–35.1 to 35.12, applies to the Department of Transportation and is here involved. In brief, section 35.2 requires that all persons who propose to bid on highway work "shall first be classified by the department as to the character and amount of work on which they shall be qualified to submit bids." Section 35.3 requires a sworn statement in response to a questionnaire prepared by the department which "shall develop fully the financial ability, adequacy of plant and equipment, organization and prior experience of the prospective bidder, and also such other pertinent and material facts as may be deemed desirable." Section 35.6 provides that a dissatisfied applicant "may request in writing a hearing before the prequalification committee." Section 35.8 reads:

Nothing contained in this act shall be construed as depriving the State Highway Commissioner[1] of the right to reject a bidder at any

---

[1] Now Commissioner of Transportation. *N. J. S. A.* 27:1A–5.

time prior to the actual award of a contract, where there have been developments subsequent to the classification of such bidder, which in the opinion of the commissioner would affect the responsibility of the bidder. Before taking final action on any such bid, the commissioner shall notify the bidder and give him an opportunity to present any additional information which might tend to substantiate the existing classification.

■ We find nothing in this statute to evidence a legislative departure from the basic principle that bidding statutes are intended for the benefit of the taxpayer rather than the bidder or prospective bidder. The statute simply provides, so far as feasible, for a determination of qualification before bidding rather than after the bids are in. The opportunity for hearing afforded by this statute merely parallels the right to hearing after the bids are in which the more conventional bidding statutes contemplate. We find no purpose to vest in a preclassified bidder any "right" which derogates the primary right of the State through its Department of Transportation to do business, in the words of *N. J. S. A.* 27:7–30, with "the lowest *responsible* bidder." (Emphasis ours.)

Thus, the bidder's "rights" remain subordinate to the primary interest of the State as a consumer. We must give ultimate regard to the State's welfare. Trap Rock and Ottilio cannot be accorded any "right" which would subvert the primary objective of the statute, that the State do business with a "responsible" bidder. With this in view, we turn to the propositions they advance.

## II

■ It is settled that the legislative mandate that a bidder be "responsible" embraces moral integrity just as surely as it embraces a capacity to supply labor and materials. *Arthur Venneri Co. v. Paterson Housing Authority, supra,* 29 *N. J.* at 403; *Mal-Bros. Contracting Co. v. Kohl,* 113 *N. J. Super.* 144, 147 (App. Div. 1971), certif. denied, 58 *N. J.* 94 (1971); *Kayfield Construction Corp. v. Morris,* 15 *A. D.*

373, 225 *N. Y. S.* 2*d* 507, 514 (1st Dept. 1962); 43 *Am. Jur., Public Works and Contracts,* § 42, *pp.* 784–85. The relevancy of moral responsibility is evident. It heads off the risk of collusive bidding. It assures honest performance. It meets the citizen's expectation that his government will do business only with men of integrity. The question then is whether under the circumstances of these cases the Commissioner could reasonably believe it was not in the best interest of government to deal with these contractors until the criminal allegations were resolved in some manner. *Cf. Arthur Venneri Co., supra,* 29 *N. J.* at 402.

We need hardly labor the point that the charges of bribery contained in the indictments would, if established, reveal a lack of moral responsibility for doing business with the State. That the charges do not relate to the performance of a government contract is of no moment; it could not be supposed that a man who would bribe law enforcement officers would bribe no one else.

█ Nor, as to Trap Rock, does it matter that the indictment runs against Stavola individually and not the corporate entity. Trap Rock urges there is no basis to "pierce the corporate veil." The concept is not relevant. There is no veil to pierce. A corporation, as such, has no moral character. The moral responsibility of a corporation is one and the same with the moral responsibility of the individuals who give it direction. See *Metropolitan Motors v. State,* 39 *N. J. Super.* 208 (App. Div. 1956); *D. B. M. Amusement Corp. v. Thourot,* 29 *N. J. Super.* 462 (App. Div. 1954), certif. denied, 15 *N. J.* 382 (1954); *George Campbell Painting Corp. v. Reid,* 20 *N. Y.* 2*d* 370, 283 *N. Y. S.* 2*d* 31, 229 *N. E.* 2*d* 602 (Ct. App. 1967), affirmed, 392 *U. S.* 286, 88 S. Ct. 1978, 20 *L. Ed.* 2*d* 1094 (1968); *Benson Parking Corp. v. O'Connell,* 31 Misc. 2*d* 1037, 220 *N. Y. S.* 2*d* 1010 (Sup. Ct. 1961). And Trap Rock cannot escape identification with Stavola upon the assertion that others handle its day-to-day operations, for Stavola owns 80% of the capital stock and is president and chairman of the board of directors.

The contractors contend the Commissioner was required by statute to specify in rules the factual patterns which spell out a lack of moral responsibility. We find no such mandate. Neither *N. J. S. A.* 27:7–35.11 of the pre-classification statute, which authorizes the Commissioner to establish "such reasonable regulations as he may deem appropriate for controlling the qualifications of prospective bidders," nor *N. J. S. A.* 52:14B–3 of the Administrative Procedure Act, which requires each agency to adopt certain rules,[2] can be read expressly to call for a definition of moral responsibility. There are good reasons not to find that requirement by implication. One is that the Legislature could hardly have intended its demand for moral responsibility to lie inert until activated by an administrative rule. Another is that since moral responsibility is common to bidding statutes, it is unlikely the Legislature wanted each agency to assay its own definition. Further the subject defies a cataloguing of all conceivable factual patterns which reveal a moral deficiency. Finally, no such detailed exposition is needed. Good moral character is demanded in sundry situations without a brochure upon the topic. The standard draws specificity from each setting. So here, the nature of the subject, *i. e.,* doing business with the State as a supplier in its procurement program, itself supplies sufficient concreteness to the concept of moral integrity. The demand is for a party who will compete honestly, and will perform honestly, and whose record does not suggest to the public a lack of that es-

---

[2]*N. J. S. A.* 52:14B–3 reads:

In addition to other rule-making requirements imposed by law, each agency shall:

(1) adopt as a rule a description of its organization, stating the general course and method of its operations and the methods whereby the public may obtain information or make submissions or requests;

(2) adopt rules of practice setting forth the nature and requirements of all formal and informal procedures available, including a description of all forms and instructions used by the agency;

(3) make available for public inspection all final orders, decisions, and opinions, in accordance with the provisions of chapter 73 of the laws of 1963 as amended and supplemented (c. 47:1A–1 et seq.)

sential integrity. Hence, the standard is adequate; indeed "it is difficult to conceive of a standard which would be both more precise and equally workable." *Elizabeth Federal S. & L. Assn. v. Howell,* 30 *N. J.* 190, 194 (1959).

The contractors rely heavily upon *Gonzalez v. Freeman,* 118 *U. S. App. D. C.* 180, 334 *F. 2d* 570 (1964). There it was held that the Federal Administrative Procedure Act required the agency to spell out the misdeeds which would entail debarment of a licensee to participate in certain transactions under the auspices of the Commodity Credit Corporation. There are differences which distinguish that case from ours.

*Gonzalez* does not clearly reveal the nature of the relationship between the Gonzalez corporation and the federal agency. The specific charge was that Gonzalez misused official inspection certificates in the resale in Brazil of surplus beans bought from the Commodity Credit Corporation. The misuse of the certificate resulted in misrepresentation of the condition of the commodity. One of the Gonzalezes was indicted and pled guilty to a lesser offense which involved substantially the same factual charge. It is clear that the case did not involve a procurement program designed to meet the government's own needs as purchaser. Rather the immediate transactions apparently related to the purchase from the government of commodities the government had acquired, as part of a composite program designed for the stabilization, support and protection of farm income and prices, the maintenance of balanced and adequate supplies of agricultural commodities, and the development of foreign markets for such commodities. 15 *U. S. C. A.* §§ 714 and 714c(f). We gather that the debarment of the Gonzalez corporation would have ended its business of reselling surplus commodities in other countries.

Thus *Gonzalez* did not involve the question whether the federal government would be compelled to procure its needs from morally unfit suppliers unless the manifold ingredients of the unfitness syndrome were anticipated in some detailed fashion. At most *Gonzalez* involved the sale of a commodity

by the government and its resale elsewhere. More importantly, Gonzalez was not debarred on an allegation that he lacked relevant moral responsibility to do business with government. Rather the court there dealt with the case on the premise that debarment was based exclusively upon the doing of a *specific act,* the misuse of an inspection certificate, and hence *Gonzalez* stands for the view that if a *specific act* is itself to be sufficient grounds for debarment, the agency should prohibit the act by rule and announce that a violation could itself lead to such consequences. We do not read *Gonzalez* to mean that the moral responsibility which government demands of those who would like to supply its needs must be defined in terms of detailed acts or omissions, failing which government must accept a bidder, however lacking he may be in integrity. Indeed, *Gonzalez* found it implicit that dishonesty would justify debarment, 334 *F.* *2d* at 576–577. It would seem incongruous to say that although honesty is so vital that it is an implied requisite, a lack of it will not be a bar unless an administrator states in advance what acts or omissions cannot be reconciled with that trait.

We should add that if we read our statute to contemplate that the Commissioner must adopt a rule spelling out the sundry acts or omissions which could lead to a finding that moral responsibility was lacking, we could not say the Legislature intended that the Commissioner's failure to do so would require a contract to be made with someone morally unfit for the State's business. The purpose of the bidding statute being to guard the State's interest rather than to advance a bidder's, that result would defeat the very purpose of the enactment.

■ Defendants say that if the statute is not read to require an itemization of acts and omissions which will support a finding of a lack of moral responsibility, there is a denial of due procses of law. We are satisfied that due process does not require that the State, in its role as a purchaser, must thus canalize the discretionary power of its

agents to protect the public interest in this area, and indeed at the pain of being compelled to contract for its needs with a bidder who is unfit. In this setting, the requirement of moral responsibility, as spelled out in judicial decisions, is constitutionally sufficient. It denies nothing that is due one who would like to compete for the State's business. A would-be bidder could hardly say he became morally irresponsible because no one defined the term for him. Nor does the standard invite or permit the kind of invidious treatment which we mentioned above in discussing possible limitations upon the doctrine of *Perkins v. Lukens Steel Co., supra,* 310 *U. S.* 113, 60 S. Ct. 869, 84 *L. Ed.* 1108, that government, like private individuals and businesses, "enjoys the unrestricted power * * * to determine those with whom it will deal."

### III

The contractors next contend the hearing accorded them did not comport with the Administrative Procedure Act. More precisely, they say that when they were classified for future bidding, they acquired a "license" within the meaning of *N. J. S. A.* 52:14B–2(f) which defines the word[3] and therefore they are protected by *N. J. S. A.* 52:14B–11 which provides that no agency shall revoke or refuse to renew a license unless the agency "has first afforded the licensee an opportunity for hearing in conformity with the provisions of this act applicable to contested cases"; that the hearing here involved did not meet the demands of *N. J. S. A.* 52:14B–10, which deals with hearings in "contested cases"; and that an indictment, not being proof of its own allegations, cannot itself sustain a revocation.

The contractors point out that it was held in *Mal-Bros. Contracting Co. v. Kohl, supra,* 113 *N. J. Super.* at

---

[3]License, as there defined, "includes the whole or part of any agency license, permit, certificate, approval, chapter, registration or other form of permission required by law."

147, that the Administrative Procedure Act applied to the debarment of a bidder by the Commissioner. We accept that proposition provided it is kept in mind in applying the statute that the so-called "license" exists to further the State's interest as a purchaser rather than to vest in the bidder some right at the expense of that public interest. Expressed another way, the Administrative Procedure Act should not be read to deny to a purchasing agency the procedural latitude necessary to protect the public interest which the bidding process was intended to secure. We repeat that we are not dealing with a license to engage in a contracting business. The contractors are free to do business with anyone willing to deal with them. The claimed right here is to compel the State to do business with them.

And the question before us is not whether an indictment may support a final order debarring a bidder. Unlike *Mal-Bros., supra,* the present proceeding did not seek that final result. The purpose here was to *suspend,* pending resolution of the criminal charges.

An indictment of course is not proof of its own allegations in the criminal trial itself, see *State v. Orecchio,* 16 *N. J.* 125 (1954). In the criminal trial, the indictment is the very charge to be made out, and it would deny the accused's right of confrontation to give the indictment any evidential value whatever. But this is not to say that an indictment is nothing at all, even within the criminal process. The indictment will suffice to warrant the arrest of the accused and to hold him to or even without bail. For an indictment, far from being a mere allegation, constitutes a finding by a grand jury that a basis exists for subjecting the accused to a trial, with the intermediate restraints upon his freedom we just mentioned.

Under our practice the grand jury is instructed:

* * * After you have heard the evidence, you are to decide whether a *prima facie* case has been made out. This means whether the State has presented evidence, which if unexplained or uncontradicted, would carry the case to a jury and justify the conviction of the accused.

Thus, with respect to Trap Rock, the indictment constitutes such a finding as to its principal, Stavola. The federal indictment of Ottilio undoubtedly means no less. Although the term "probable cause" seems to be used in the federal courts, *Hall, Kamisar, LaFave, and Israel, Modern Criminal Procedure* (3d ed. 1969), *pp.* 793–794; 8 *Moore, Federal Practice* (2d ed.) § 603[2], *p.* 6–14; 1 *Wright, Federal Practice and Procedure* (1969), § 110, *p.* 198, it probably means a *"prima facie"* case rather than the less exacting "probable cause" which will justify a search, *State v. Burnett,* 42 *N. J.* 377, 386–388 (1964); *State v. Davis,* 50 *N. J.* 16, 23–24 (1967). Whatever the meaning of "probable cause" in this context, the federal indictment imports the existence of facts sufficient to subject a defendant to trial and to the intermediate deprivations already mentioned.

An indictment, State or federal, is hardly a neutral fact for all purposes. In the area of our present concern, it cannot be said that an indictment has no meaning. On the contrary, the indictment means that a basis exists to believe the charge if the evidence on hand is not explained or contradicted. And if the charge against the contractor is true, his lack of responsibility is a present fact. A conviction thereafter will merely evidence that the disqualifying attribute did exist.

 The question is whether the Legislature intended the State's agency to enter into contracts with a would-be contractor in the face of a grand jury's finding that there is a *prima facie* basis for a belief that the contractor is presently unfit for the job. We are satisfied the Legislature did not intend that course. The alternatives then are but two — a suspension pending the resolution of the criminal charge or an immediate trial by the agency itself of that charge. To require the agency to try the criminal charge would not be appropriate. The evidence might not be available to the agency, and if it were, the right to a fair trial in the criminal case might be infringed by the prior trial and decision in the administrative hearing. The remaining

course is the one pursued here, of immediately suspending the bidder's classification, coupled with an opportunity to the bidder to come forward, if he can, with any showing from which the agency could find it would not disserve the public interest to contract wtih him notwithstanding the grand jury's finding of a *prima facie* basis for the disabling criminal charge.

We have consistently recognized an implied power in the State and its subdivisions to suspend its employees or officers pending disposition of indictments or other charges where the public interest so requires. *Russo v. Walsh,* 18 *N. J.* 205, 212 (1955); *De Marco v. Board of Chosen Freeholders of Bergen County,* 21 *N. J.* 136, 139, 145 (1956); *Winne v. Bergen County,* 21 *N. J.* 311 (1956); *Romanowski v. Board of Education,* 89 *N. J. Super.* 38, 40–41 (App. Div. 1965). The same public interest should justify a refusal to engage a contractor pending resolution of a criminal charge which, if true, would disqualify. Nor does it improve the contractors' position to say the preclassification procedure described above constitutes them "licensees," for the license is no more than a license to seek contractual relations with the State.

Indeed, even with respect to licenses to engage in a business or activity, it is generally said to be implicit that a suspension may be ordered pending investigation when the public interest so requires. *Davis, Administrative Law Treatise* (1958), § 7.08, *pp.* 438–444, 1970 *Supp.* § 7.08, *pp.* 331–333; *Gellhorn & Byse, Administrative Law* (4th ed. 1960); *pp.* 764–767; see *Bechler v. Parsekian,* 36 *N. J.* 242 (1961). The fact of an indictment for crime has been held an adequate basis for an immediate suspension, *Halsey Stuart & Co. v. Public Service Commission,* 212 *Wis.* 184, 248 *N. W.* 458 (1933), and for the rejection of a low bid for public work, *Zara Contracting Co. v. Cohen,* 23 *A. D.* 2d 718, 257 *N. Y. S. 2d* 118 (3d Dept. 1965). In *Gonzalez v. Freeman, supra,* 334 *F. 2d* 570, upon which the contractors rely heavily in other respects, the licensee did not challenge

the power of the Secretary of Agriculture to suspend the license temporarily even in advance of an indictment (*pp.* 573, 579). What was there under attack was a final order in a debarment proceeding.

The classification statute itself recognizes a power to reopen the subject of a contractor's qualification on the basis of new information. *N. J. S. A.* 27:7–35.8 provides:

> Nothing contained in this act shall be construed as depriving the State Highway Commissioner [now Commissioner of Transportation] of the right to reject a bidder at any time prior to the actual award of a contract, where there have been developments subsequent to the classification of such bidder, which in the opinion of the commissioner would affect the responsibility of the bidder. Before taking final action on any such bid, the commissioner shall notify the bidder and give him an opportunity to present any additional information which might tend to substantiate the existing classification.

The Administrative Procedure Act does not negate that power. *N. J. S. A.* 52:14B–11 of that act reads in part:

> * * * Any agency that has authority to suspend a license without first holding a hearing shall promptly upon exercising such authority afford the licensee an opportunity for hearing in conformity with the provisions of this act.

Thus, granted that the classification to bid conferred a "license" to do business with the State, the Administrative Procedure Act did not bar the Commissioner's temporary suspension.

For these reasons we cannot say the Commissioner acted unreasonably when he suspended the classifications for bidding on the basis of the indictments. It was appropriate, and sufficient, to offer the contractors an opportunity to explain away the criminal charges to obviate the temporary suspension. There, of course, is a right to a further hearing with respect to debarment. It is only a temporary suspension that is before us, and it is as to that action that we find the proffered hearing was appropriate and sufficient.

The contractors point out that if they are ultimately vindicated, they will be unable to recoup profits they might have made under contracts with the State,[4] and add that in fact they have heretofore relied heavily upon public work. We are mindful that such losses cannot be recovered, but the bidding structure, we repeat, is for the benefit of the public, and we see no basis for differentiation among prospective bidders on the basis of the volume of their public contracts. The economic problem must remain theirs. It lies with them to do what they can to alleviate their situations. They might on that account accept the opportunity offered by the Commissioner to explain away the criminal charges, or they might decide to press for a prompt trial of the indictments. But we see no sound basis to compel the State to do business with a person when his responsibility is thus questioned by an indictment.

The contractors say that a temporary suspension, even if consistent with our statutes, nonetheless offends due process of law. We think the considerations already discussed dispel a claim of fundamental unfairness. We are not referred to any case holding the other way.

The power of government to debar a bidder pending a later hearing was recognized in *Goldberg v. Kelly,* 397 *U. S.* 254, 90 S. Ct. 1011, 25 *L. Ed. 2d* 287 (1970). There five members of the Court held that welfare recipients could not be removed from the rolls until after an appropriate hearing with respect to their continued eligibility to receive aid. The majority, however, recognized that "some governmental benefits may be administratively terminated without affording the recipient a pre-termination evidentiary hearing." 397 *U. S.* at 263, 90 S. Ct. at 1018, 25 *L. Ed. 2d* at 296. In footnote 10 at the page just cited, the majority noted that

---

[4]Absent statute, public officers suspended because of an indictment are also without remedy even though acquitted on the trial of the indictment. See *De Marco v. Board of Chosen Freeholders of Bergen County supra,* 21 *N. J.* at 140–144; *Winne v. Bergen County, supra,* 21 *N. J.* at 315–316.

in *R. A. Holman & Co. v. SEC,* 112 U. S. App. D. C. 43, 299 F. 2d 127, 131 (1962), *cert.* denied, 370 *U. S.* 911, 82 S. Ct. 1257, 8 *L. Ed.* 2d 404 (1962), the Court of Appeals said that "In a wide variety of situations, it has long been recognized that where harm to the public is threatened, and the private interest infringed is reasonably deemed to be of less importance, an official body can take summary action pending a later hearing." As an "example," footnote 10 cites "Gonzalez v. Freeman, 118 U. S. App. D. C. 180, 334 F. 2d 570 (1964) (disqualification of a contractor to do business with the Government)." The reference, of course, is to the *Gonzalez* case we have already discussed. In holding that a pretermination hearing was required as to continued welfare eligibility, the majority in *Goldberg v. Kelly* stressed the extreme need of the individual and found that important governmental interests were concurrently advanced by such a pretermination hearing. In discussing the essential needs of the welfare recipient, the majority noted that that "factor" was "not present in the case of the blacklisted government contractor, the discharged government employee, the taxpayer denied a tax exemption, or virtually anyone else whose governmental entitlements are ended." 397 *U. S.* at 264, 90 S. Ct. at 1018, 25 *L. Ed.* 2d at 297. These observations support our view that there is no serious basis for a due process claim in the cases before us.

 ██ One matter remains. It will be recalled that after the suspension Trap Rock was found to be low bidder on bids theretofore submitted. The question is whether a distinction can be drawn between the right of Trap Rock to bid and its right to receive an award under bids already in. We see no basis for a distinction. The public interest in the State's contracts is no less demanding because bids have been submitted. *N. J. S. A.* 27:7–35.8 expressly contemplates rejection of a bid on the basis of developments after prequalification. It follows that in such circumstances the procuring authority, after giving the low bidder such op-

portunity to dissipate the impact of the indictment as the public need will permit, may, upon the low bidder's failure to do so, make an award to the next low bidder.

The judgments of the Appellate Division are reversed, and the actions of the Commissioner are affirmed, without prejudice, of course, to the right of the contractors to a hearing with respect to final debarment when such a hearing becomes feasible.

*For reversal*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, SCHETTINO and MOUNTAIN—6.

*For affirmance*—None.