159 N.J. Super. 75 (1978)
386 A.2d 1364
CONSOLIDATED ENTERPRISES, INC., A NEW JERSEY CORPORATION, PLAINTIFF-APPELLANT,
v.
HOUSING AUTHORITY OF THE CITY OF NEWARK, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued April 10, 1978.
Decided April 25, 1978.
*76 Before Judges MICHELS, PRESSLER and BILDER.
Mr. Barry I. Siegel argued the cause for appellant (Messrs. Gutkin, Miller, Shapiro and Berson, attorneys; Messrs. Isles, Newman and Weissbard, of counsel).
Mr. Emil W. Nardachone argued the cause for respondent (Mr. Steven C. Rother, attorney).
BILDER, J.S.C. (temporarily assigned).
This is an appeal by a low bidder from an order of the Law Division upholding a decision by the Newark Housing Authority to reject its bid on the grounds of irresponsibility.
In September 1977 the Authority advertised for bids pursuant to the Local Public Contracts Law, N.J.S.A. 40A:11-1 et seq., for the stabilization of a certain 40-acre tract of land located in Newark. The proposed contract involved moving earth fill already on the site, importing additional fill and installing test equipment for monitoring soil stability.
At the time set for the opening of bids, September 29, two bids were submitted  a bid by appellant for $923,060.60 and by another for $1,286,060.
*77 By letter of November 22, 1977 the Authority rejected appellant's bid, giving as the reason a pending suit in which the Attorney General of the State of New Jersey was seeking to impose a constructive trust against appellant for false billing on a public contract, and resultantly that it was not financially capable of carrying out the contract. This rejection led to the instant suit in which appellant sought to require the award of the bid to it.
At the initial hearing it appeared that the Authority had not afforded appellant an opportunity to be heard on the rejection, so the matter was remanded for such a hearing.
Following a hearing held on December 19, 1977 the Authority reaffirmed its rejection of appellant's bid, giving now as its reasons possible collusion, disparity of figures, possible criminal connections, lack of fixed assets and pending court actions which, taken together, "raise serious questions that remain unanswered." The Authority also noted at that time the appellant's refusal to testify at the hearing.
From a review of the record we are satisfied that the only reason given by the Authority which are supported by the record are those relating to appellant's moral responsibility  and, more specifically, to the issues raised by the lawsuit and the questions raised by the apparent federal grand jury investigation. We find the other matters to be insubstantial (unidentified gossip of possible criminal connections), irrelevant (disparity in the amounts of the two submitted bids; lack of fixed assets) or unsupported by the record (collusion with other prospective bidders).

The Attorney General's Lawsuit
On September 28, 1977 the Attorney General of New Jersey instituted a civil suit against appellant and its president, Richard D'Agostino, as well as others, alleging among other matters, a fraudulent bill-padding scheme in *78 connection with a Passaic Valley Sewerage Commission sludge and waste removal contract.
In an Amended Verified Complaint filed on October 13, 1977 the Attorney General alleged [in count two]:
20. The defendants, Airport, Consolidated, D'Agostino, Fiumara and Ricci acted improperly in dealing with the P.V.S.C. because they were neither fair nor frank, they breached their fiduciary duties to the P.V.S.C. and they also acted in a fraudulent manner with intent to obtain benefits to which they were not entitled to under any contract or other business arrangement in connection with the P.V.S.C. project. The aforementioned breach of trust and fraud in the course of dealing with the P.V.S.C. is based on the fact that the defendant, D'Agostino, acting on behalf of Consolidated, during June, July, August and September, 1977, received inflated bills from Airport for work done by Consolidated in connection with the P.V.S.C. project. Consolidated submitted these bills to Vi-Con for payment. Consolidated in turn paid the inflated bills to Airport and Airport returned a percentage of the excess billing to Consolidated. In addition, during the same period of time, Consolidated submitted fraudulent worksheets to Airport for loads never taken from the P.V.S.C. project. Consolidated again submitted these bills to Vi-Con for payment and would subsequently pay Airport and receive a percentage of the fraudulent billings back from Airport. The monies paid by Vi-Con for these fraudulent billings were reimbursed by the P.V.S.C. At this time approximately $6,000.00 has been received by Consolidated pursuant to these fraudulent schemes.
In connection with the suit, the Attorney General had theretofore filed on September 28, 1977 (at the time of the original complaint) the following affidavit of one Patrick J. Kelly:
1. From December, 1976 until early September, 1977, I was manager of Alamo Transportation, Ltd. a firm that consisted entirely of State and Federal undercover agents except for myself.
2. Alamo Transportation, Ltd. was organized to infiltrate and investigate organized crime. It held itself out to be a firm engaged in the business of offering trucking and tractor equipment and services.
3. In May, 1977, one Tino Fiumara approached me to work with Theodore Fiori and Larry Ricci in forming a landfill and waste removal firm. The initial landfill to be operated by this new firm was T & J Landfill which at that time was operated by Theodore Fiori.
*79 4. The landfill and waste removal firm was incorporated in late May, 1977 under the name Airport Landfill Corp. with Larry Ricci as President.
5. Beginning in June, 1977, Alamo Transportation, Ltd. began renting tractors to Airport Landfill Corp. for use on various waste removal operations.
6. During June, 1977, I was approached by Consolidated Enterprises (Consolidated). Consolidated is a trucking firm which has a subcontract with Vi-Con, a contractor responsible for having decomposed garbage removed from one section of the Passaic Valley Sewer Authority (P.V.S.A.) project, a $500,000,000.00 federally financed sewer project.
7. During the months of June, July and August, 1977, Alamo Transportation, Ltd. provided tractors to Airport Landfill for use in connection with sludge removal activities on the P.V.S.A. project.
8. Prior to the month of July, 1977, Consolidated was disposing of the material taken from the P.V.S.A. project at the Municipal Sanitary Landfill, Inc. a privately owned landfill in Kearny, New Jersey.
9. In July, 1977 I learned that through the efforts of Tino Fiumara and Carmine Franco, the President of the New Jersey Trade Waste Association, an association of waste carting firms, the Municipal Sanitary Landfill, Inc., would be closed to Consolidated thereby forcing Consolidated to find an alternate landfill site.
10. Consolidated found another site operated by Frank Arace of (Arace) Brothers. Consolidated had been paying 75 a cubic yard to dump its load at Municipal. Consolidated negotiated with Arace to dump loads at Arace for .85¢ a cubic yard.
11. When Carmine Franco and Tino Fiumara learned that Consolidated was planning to dump at Arace, Fiumara instructed me to see that we (Franco, Fiumara, Ricci, Coppola and myself) get some money from Consolidated. I consulted with Franco on what rate Consolidated would be charged and suggested a price of $1.10 per yard which would leave Arace .85¢ per yard and leave .25¢ per yard to be distributed among Franco, Fiumara, Ricci, Coppola and myself.
12. In July, 1977, a meeting was arranged between Franco Arace and myself to solidify this arrangement.
13. During the months of July and August, 1977, Consolidated did dump loads at Arace and was billed $1.10 per yard per load and Airport Landfill handled the billing and was paid by Consolidated who then billed Vi-Con.
14. In July, 1977, Richard D'Agostino proposed to me an arrangement whereby he would submit fraudulent billings to Vi-Con for carting work performed by Consolidated at the P.V.S.A. project.
*80 15. D'Agostino suggested that the Airport Landfill submit inflated bills to Consolidated for the price charged on loads disposed of by Consolidated from the P.V.S.A. project.
16. D'Agostino would then submit these inflated bills to Vi-Con for payment to Consolidated.
17. Consolidated would then pay the inflated bill to Airport Landfill and Airport Landfill would then kickback a percentage of the excess billing to Consolidated.
18. I related this scheme to Ricci, Coppola, Fiore and Fiumara approved the arrangement which was then put into effect by Airport Landfill and Consolidated.
19. D'Agostino also proposed that bills be submitted by Consolidated to Airport Landfill for loads that were never dumped at Arace.
20. Pursuant to this arrangement Consolidated would add a number of loads to its daily work sheets that were never taken from the P.V.S.A. project.
21. Consolidated then submitted these fraudulent worksheets to Airport Landfill and Airport, on behalf of Arace, would bill Consolidated for the number of loads reflected on the worksheets. The Airport Landfill bill would then be submitted to Vi-Con by Consolidated to substantiate Vi-Con's payments to Consolidated. Consolidated would then pay Airport Landfill for the loads billed. Airport would again kickback to Consolidated a percentage of the monies obtained through the fraudulent billings.
22. I related this arrangement to Ricci, Coppola and Fiore and Fiumara and they approved the arrangements which was subsequently put into effect.
23. I have knowledge at this point in time approximately $6,000.00 has been paid to Consolidated by Airport Landfill as Consolidated's share of its proceeds from these fraudulent billing schemes.[1]

The Federal Grand Jury Investigation
On October 28, 1977 a subpoena was issued out of the United States District Court for the District of New Jersey on application of the United States Department of Justice requiring the Authority to produce before the grand jury *81 * * * any and all books, records and other documents, including but not limited to bids, bid specifications, correspondents, contracts, internal memoranda and any and all allied and related papers of whatsoever nature, pertaining to or having reference to Parcel 107-1B; Parcel 103-9; Cross Bay Excavation Co.; Airport Landfill; Consolidated Enterprises, Inc.; and Bellezza Co., Inc., for the period January 1, 1975 to date.

The December 19, 1977 Hearing
The Authority could not reject appellant's low bid without first affording it a hearing. Trap Rock Industries v. Kohl, 59 N.J. 471, 490 (1971).
The November 22, 1977 rejection of appellant's bid without a hearing was thus unlawful. This impropriety was recognized by Judge Blake, who quite properly remanded the matter for a hearing. On December 13, 1977 Judge Blake ordered that "sometime between now and December 20th [counsel for the parties] will arrange for the hearings which are necessary in this case." Pursuant thereto hearings were had on December 19, 1977, thus correcting the deficiency in the Authority's procedure. See Stamato & Co., Inc. v. Vernon Tp., 131 N.J. Super. 151, 156 (App. Div. 1974).
At this hearing, among other things proofs were put forward by the Authority's general counsel with respect to the Attorney General's suit and the federal grand jury subpoena. At that same hearing appellant's principals were invited  indeed, requested  to testify but refused to do so.

The Disqualification
In Trap Rock Industries v. Kohl, supra, it was held that a prospective bidder might be disqualified by reason of an indictment for conspiracy to bribe a state police officer. The indictment was held to be prima facie evidence of a lack of moral responsibility and to justify the Commissioner of Transportation in suspending the qualifications for bidding. Id. 59 N.J. at 490. The court noted:
*82 It was appropriate, and sufficient, to offer the contractors an opportunity to explain away the criminal charges to obivate the temporary suspension. Ibid.
The same result was reached in the a fortiori case of a guilty plea to conspiracy to fix bidding on public contracts. Gallo Asphalt Co. v. Sagner, 71 N.J. 405 (1976).
The instant case presents the question as to whether the principles of moral responsibility applied in Trap Rock to an indicted bidder apply to a situation where the contracting agency feels it has reason short of indictment to question moral responsibility.
In Arthur Venneri Co. v. Paterson Housing Auth., 29 N.J. 392 (1959), the court said:
To reject the lowest bid there must be evidence of such character concerning the irresponsibility of the bidder as would cause fair-minded and reasonable men to believe it was not in the best interest of the municipality to award the contract to the lowest bidder. Id. at 402.
Here there were sufficient facts for a fair-minded person to say come forward and explain. The Attorney General had filed a verified complaint against appellant which alleged, among other matters, the participation of appellant and its president in a fraudulent billing scheme with respect to a public contract. That complaint was accompanied by the affidavit of Patrick J. Kelly alleging the same fraudulent scheme in more detail. In addition, all of the Authority's records pertaining to appellant's bid for the contract at issue were subpoenaed by a federal grand jury.
While the evidence of criminal activity is admittedly inconclusive, it nonetheless is sufficient to at least put the Authority on inquiry notice as to appellant's responsibility. The statutory mandate that the contract be awarded to the lowest responsible bidder embraces the motion of "moral integrity just as surely as it embraces a capacity to supply labor and materials". Trap Rock Industries v. Kohl, supra, 59 N.J. at 481. The warning signs were at least enough to require *83 appellant to come forward with an explanation. See Arthur Venneri Co. v. Paterson Housing Auth., supra.
As we noted in Lehrhaupt v. Flynn, 140 N.J. Super. 250 (App. Div. 1976), aff'd per curiam 75 N.J. 459 (1978):
By accepting public employment an individual steps from the category of a purely private citizen to that of a public citizen. And in that transition, he must of necessity subordinate his private rights to the extent that they may compete or conflict with the superior right of the public to achieve honest and efficient government. [at 262]
Appellant was afforded an opportunity to come forward with an explanation and failed or neglected to do so. As the court below noted, when the instant circumstances are coupled with a willful refusal to come forward to explain them away, fair-minded and reasonable people may conclude that appellant does not meet the standard of moral responsibility required for bid qualification.
Affirmed.
NOTES
[1] While it is immaterial to the issues raised here, for the sake of completeness we note that the Attorney General's suit was dismissed without prejudice on December 6, 1977 when the court denied an application to prohibit the deposing of Kelly during the pendency of certain criminal investigations then being conducted by the State, and the State indicated it would not comply with the discovery rules.