No. 71–744. ADDONIZIO *v.* UNITED STATES;
No. 71–745. LAMORTE *v.* UNITED STATES;
No. 71–754. VICARO *v.* UNITED STATES; and
No. 71–756. BIANCONE *v.* UNITED STATES. C. A. 3d Cir. Certiorari denied. Reported below: 451 F. 2d 49.

MR. JUSTICE DOUGLAS, dissenting.

At the trial involved in these cases there was much evidence of corrupt practices by the administration of petitioner Addonizio during his tenure as mayor of Newark, New Jersey. But the question posed to the

jury below was not whether these petitioners had engaged in corrupt practices, but the narrower issue of whether they had entered into and executed a criminal agreement to extract kickbacks from public contractors through threats of physical harm or economic ruin in violation of 18 U. S. C. § 1951.[1] Although the petitioners were charged with 65 substantive acts of coercive extraction of kickbacks, the key issue in the trial was who, if anyone, had conspired to commit these acts. Absent a finding that such a confederation had been formed, most of the evidence which damaged the petitioners could not have been introduced at all inasmuch as this evidence was hearsay admitted provisionally under the so-called coconspirator exception. That the jury found a conspiracy to have existed, however, was under the circumstances of this trial the unsurprising and virtually inevitable result of the many disabilities imposed upon an accused by the ordeal of a multi-defendant conspiracy prosecution.[2]

---

[1] Section 1951 provides:

"(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

.        .        .        .        .

"(b)(2) The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."

[2] The potential for abuse of multi-defendant conspiracy proceedings has been discussed in O'Dougherty, Prosecution and Defense Under Conspiracy Indictments, 9 Brooklyn L. Rev. 263 (1940); Note, Developments in the Law: Criminal Conspiracy, 72 Harv. L. Rev. 922, 983 (1959); Wessel, Procedural Safeguards for the Mass Conspiracy Trial, 48 A. B. A. J. 628 (1962); Goldstein, The *Krulewitch* Warning: Guilt By Association, 54 Geo. L. J. 133 (1965).

Mr. Justice Jackson catalogued many of these disabilities in his well-known concurrence in *Krulewitch* v. *United States*, 336 U. S. 440, 446 (1949), reversing a conspiracy conviction, where he concluded that the prevailing "loose practice as to [the conspiracy] offense constitutes a serious threat to fairness in our administration of justice." He criticized the tendency of courts to dispense "with even the necessity to infer any definite agreement, although that is the gist of the offense." *Id.*, at 452. As to the procedural evils of this device he found that the risk to a codefendant of guilt by association was abnormally high:

> "A co-defendant in a conspiracy trial occupies an uneasy seat. There generally will be evidence of wrongdoing by somebody. It is difficult for the individual to make his own case stand on its own merits in the minds of jurors who are ready to believe that birds of a feather are flocked together. If he is silent, he is taken to admit it and if, as often happens, co-defendants can be prodded into accusing or contradicting each other, they convict each other." *Id.*, at 454.

Mr. Justice Jackson also regretted the wide leeway that prosecutors enjoyed in the broad scope of evidence admissible to prove conspiracy (and consequently to prove substantive acts as well). Under conspiracy law, the declarations and acts of any confederate in furtherance of the joint project are attributable to and admissible against all of its participants. This is true even if the declarant is not available for cross-examination. Moreover, such statements are admissible "subject to connection" by the prosecutor later in the trial. At the close of the Government's case, for example, the judge may believe that the Government failed to present a jury question as to a defendant's participation in a

collective criminal plot. In such a case, the judge must ask the jury to disregard the provisionally admitted hearsay. Obviously, however, it will be difficult in a lengthy trial (such as this one filling 5,500 pages of transcript) for jurors to excise the stricken testimony from their memories. In the alternative case where the judge believes that a jury question has been presented as to a defendant's participation in a criminal enterprise, the jury is permitted to consider the provisionally admitted matter in determining whether or not a' defendant was a conspirator. In other words, the jury is allowed to assume its ultimate conclusion. Mr. Justice Jackson was particularly sensitive to the abuse potential in this vicious logic:

> "When the trial starts, the accused feels the full impact of the conspiracy strategy. Strictly, the prosecution should first establish *prima facie* the conspiracy and identify the conspirators, after which evidence of acts and declarations of each in the course of its execution are admissible against all. But the order of proof of so sprawling a charge is difficult for a judge to control. As a practical matter, the accused often is confronted with a hodgepodge of acts and statements by others which he may never have authorized or intended or even known about, but which help to persuade the jury of existence of the conspiracy itself. In other words, a conspiracy often is proved by evidence that is admissible only upon assumption that conspiracy existed. The naive assumption that prejudicial effects can be overcome by instructions to the jury, *cf. Blumenthal* v. *United States,* 332 U. S. 539, 559, all practicing lawyers know to be unmitigated fiction. See *Skidmore* v. *Baltimore & Ohio R. Co.,* 167 F. 2d 54." *Id.,* at 453.

There are other disabilities. Often testimony will be receivable only against a particular codefendant, yet it may also inculpate another accused such as where (a) a codefendant "opens the door" to prejudicial evidence by placing his reputation in issue,[3] (b) a codefendant wants to place before the jury information which is helpful to him but is damaging to other defendants, or (c) the Government desires to offer evidence admissible against less than all of the codefendants. Cautionary instructions, of course, are routinely given where such circumstances arise but we have often recognized the inability of jurors to compartmentalize information according to defendants. *Bruton* v. *United States,* 391 U. S. 123 (1968). See also *Jackson* v. *Denno,* 378 U. S. 368, 388 (1964); *Krulewitch* v. *United States, supra,* at

---

[3] An example of a single defendant's opening the door to prosecution rebuttal prejudicial to other defendants was presented in the famous *Apalachin* trial (*United States* v. *Bufalino,* 285 F. 2d 408 (CA2 1960)):

"The reputation of the Apalachin delegates and the character of the meeting had been the subject of much public comment during the two years before trial. Many reports had described the lengthy criminal records of some of the delegates, had characterized the meeting as a convention of the 'Mafia' and had given other lurid details of what had occurred. None of this evidence was considered sufficiently material to the charge to warrant its introduction at trial.

"Toward the end of the trial, one of the defendants placed his reputation squarely in issue. He called witnesses who testified to his excellent reputation for truth and veracity at the time of the trial.

"Ordinarily it would have been entirely proper to attempt to refute this testimony by cross-examining with reference to the earlier publicity; the defendant himself had elsewhere complained about how much it had hurt his reputation. However, such evidence might have had equally serious adverse effects upon the nineteen co-defendants, who had done nothing to open the door against themselves."

Wessel, Procedural Safeguards for the Mass Conspiracy Trial, *supra,* n. 2, at 631.

453 (quoted above). This shortcoming of the jury is compounded when, as here, the jury is also asked to digest voluminous testimony.

A victim of the multi-defendant conspiracy trial has fewer options for trial strategy than the ordinary defendant tried alone. Counsel may reluctantly give up the option of pointing the accusing finger at his client's codefendants in order to obtain similar concessions from other trial counsel. Counsel must also divert his preparation in part toward generating possible responses to evidence which may be admissible only against other codefendants. As for the defendant, he may be put to the choice of hiring less experienced counsel or less actively pursuing discovery or investigation because of the higher legal expenses imposed by longer joint trials. Furthermore, although an accused normally has "the right to present his own witnesses to establish a defense," *Washington* v. *Texas,* 388 U. S. 14, 19 (1967), an accused in a mass conspiracy trial may not put on his codefendants without their prior waivers of their absolute rights not to testify.[4]

All of these oppressive features were present in various degrees in this trial. But, in particular, the most onerous burden cast upon these petitioners was their inability to cross-examine each other as to comments which Government witnesses said they had heard them utter. The Court of Appeals recognized that "[t]here

---

[4] Even at a severed trial of only one defendant, another alleged coconspirator may, if called to testify, invoke his privilege against self-incrimination. Where the severed trial is delayed until after the acquittal or finalized conviction of the witness, however, invocation of the privilege would be improper. In any event, even if the witness refused to answer questions, the defendant would at least obtain whatever inference of innocence might result from the apparent guilt of the witness.

was much testimony as to statements made by various co-conspirators during the course, and in furtherance of the conspiracy." 451 F. 2d 49, 71. For example, one important prosecution witness testified that he had been a contractor hired by the city administration and that one of the accused conspirators, "Tony Boy" Boiardo, had told him: "You pay me the 10% . . . I take care of the Mayor. I take care of the Council." (App. 2611a.) The lawyer for the former mayor, however, was not permitted to put Boiardo on the stand and to ask him whether Addonizio had, in fact, entered into an agreement with him to coerce kickbacks. This handicap of an accused is at war with the holdings of this Court that a defendant should be permitted to confront his accusers, especially where, as here, their declarations might have been purposely misleading or self-serving. *Pointer* v. *Texas,* 380 U. S. 400, 407 (1965); *Douglas* v. *Alabama,* 380 U. S. 415 (1965); *Brookhart* v. *Janis,* 384 U. S. 1 (1966); *Bruton* v. *United States, supra; Barber* v. *Page,* 390 U. S. 719 (1968); *Roberts* v. *Russell,* 392 U. S. 293 (1968). *Dutton* v. *Evans,* 400 U. S. 74 (1970), is not inconsistent with this proposition. There the Court found that the hearsay was probably reliable. "[T]he circumstances under which [the declarant] made the statement were such as to give reason to suppose that [he] did not misrepresent [his coconspirator's] involvement in the crime." *Id.,* at 89. On the other hand, involved here were declarants, as mentioned earlier, who might have been motivated to misrepresent the roles of other parties in order to induce contractors, such as Rigo (the Government's key witness), to make kickbacks. Moreover, in *Dutton* the hearsay was "of peripheral significance at most," whereas here much of the case against the petitioners, as the

Court of Appeals pointed out, was admitted under the coconspirator exception to the hearsay rule.[5]

In addition, the petitioners were deprived of the right to cross-examine codefendant Gordon (who is not one of the petitioners). He had testified at the prior grand jury proceeding and that testimony was introduced at trial by the Government to corroborate the story of the Government's key witness, Rigo, as to various kickback transactions. The circumstances at trial were substantially similar to those involved in *Bruton* except that Gordon's grand jury remarks did not directly mention his codefendants. Normally, that difference would be sufficient to support the lower court's finding that *Bruton* was inapposite but for the fact that the Government's case against all of the defendants turned upon Rigo's credibility. On cross-examination of Rigo, the codefendants had relentlessly attacked his credibility. But when the Government introduced the grand jury transcript in rebuttal, the defense challenge was completely terminated because Gordon, who was also on trial, could not be called to the stand. The judge, of course, gave instructions to the jury to consider the impact of the transcript upon Rigo's credibility only when assessing Gordon's guilt, but it is doubtful that the jurors could faithfully adhere to the delicate logic that Rigo may have told the truth as to Gordon but

---

[5] The *Dutton* plurality opinion found the coconspirator hearsay had played a minor role in the trial:

"In the trial of this case no less than 20 witnesses appeared and testified for the prosecution. Evans' counsel was given full opportunity to cross-examine every one of them. The most important witness, by far, was the eyewitness who described all the details of the triple murder and who was cross-examined at great length. Of the 19 other witnesses, the testimony of but a single one is at issue here." *Dutton* v. *Evans,* 400 U. S. 74, 87 (1970).

may have lied as to his codefendants. The contrary conclusion, to borrow from Mr. Justice Jackson, would be "unmitigated fiction." *Krulewitch* v. *United States, supra,* at 453.

In light of the claims of prejudice committed in this multi-defendant conspiracy trial, I would grant certiorari to consider whether the *extensive* reliance by the prosecutor on the coconspirator exception to the hearsay rule and the admission of the Gordon transcript deprived these petitioners of constitutional rights.