GALLO ASPHALT CO., A PARTNERSHIP, GALLO ASPHALT CORPORATION, AND PASSAIC CRUSHED STONE CO., INC., APPELLANTS, v. ALAN SAGNER, COMMISSIONER, DEPARTMENT OF TRANSPORTATION, STATE OF NEW JERSEY, RESPONDENT.

Argued April 27, 1976—Decided November 8, 1976.

Mr. *Robert B. Meyner* argued the cause on behalf of appellants (*Messrs. Meyner, Landis & Verdon,* attorneys; *Mr. Jeffrey L. Reiner* on the brief).

Mr. *Richard L. Rudin,* Deputy Attorney General argued the cause on behalf of respondent (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney; *Mr. Stephen Skillman,* Assistant Attorney General, of counsel; *Mr. Rudin* on the brief).

The opinion of the court was delivered by

PASHMAN, J. This is an appeal by two business entities challenging a debarment order which precludes them from bidding on any public projects financed by the State Department of Transportation (D.O.T.).[1] Appellants are family enterprises which are owned and operated by two brothers,

---

[1] *N. J. S. A.* 27:7–35.8   Developments subsequent to classification; right to reject bidder

Nothing contained in this act shall be construed as depriving the State Highway Commissioner of the right to reject a bidder at any time prior to the actual award of a contract, where there have been developments subsequent to the classification of such bidder, which in the opinion of the commissioner would affect the *responsibility* of the bidder. Before taking final action on any such bid, the commissioner shall notify the bidder and give him an opportunity to present any additional information which might tend to substantiate the existing classification. [Emphasis supplied.]

Gene and Vincent Gallo. Respondent is Alan Sagner, Commissioner of D.O.T., who imposed the debarment order.

On July 31, 1974, Gallo Asphalt Co. (Gallo Asphalt, a partnership) and Passaic Crushed Stone Co., Inc. (Crushed Stone, a corporation), together with one other business entity and several individuals, were indicted by a State Grand Jury for conspiring to fix bids on contracts for the construction and resurfacing of roads in Passaic County. The indictment charged a conspiracy to rig bids by controlling the price and supply of asphalt, by collusive bidding, by allocation of territories, by fixing prices, and by inflating prices of contracts to finance bribes to public officials. Mario Gallo, the older brother of Gene and Vincent, was named as a co-conspirator but not as a defendant in the indictment. Prior to his death in February 1970, Mario had been a partner in Gallo Asphalt and a stockholder in Crushed Stone with his two brothers. He had also been the chief executive in these as well as other family-owned companies.

As a result of a plea bargain with the Attorney General's office, Gene and Vincent Gallo entered guilty pleas on behalf of Gallo Asphalt and Crushed Stone before the late Judge John A. Ackerman on October 29, 1974. Pursuant to *R.* 3:9–2,[2] and with the consent of the prosecuting attorney, Judge Ackerman issued two orders prohibiting the use of the guilty pleas of the two companies as evidence "in any civil proceedings which may now be pending or which may be instituted in the future." Nevertheless, the following day the Commissioner notified Gene and Vincent Gallo that the indictment, guilty pleas and convictions indicated the lack of "responsibility" of Gallo Asphalt and of Gallo Asphalt Corp. (Gallo Corp.),[3] and affected their ability to

---

[2]*R.* 3:9–2 provides in pertinent part:
For good cause shown the court may, in accepting a plea of guilty, order that such plea not be evidential in any civil proceeding.

[3]The third appellant, Gallo Asphalt Corp. (Gallo Corp., a corporation) was not indicted. Gallo Asphalt was dissolved as a partnership

do business with D.O.T. As a result, he informed them that he had suspended these companies, including their affiliates and subsidiaries, in their capacities as contractors, subcontractors and suppliers, from the classification lists of prequalified bidders with D.O.T. They were permitted to request a hearing at which they could show cause why the suspension should not be continued.

Appellants sought an expedited hearing and appeared before the Commissioner on November 19, 1974. At the outset, counsel for the D.O.T. (an attorney from the Attorney General's office) stated that the parties had agreed on "telescoping" the proceeding to consider the propriety of debarment as well as suspension.[4] He then entered into evidence the Commissioner's letter of suspension, which adverted to appellants' guilty pleas and convictions. He also confirmed the allegations in the letter by questioning appellants' counsel as to the date of the hearing before Judge Ackerman and the details of the sentencing. Relying on the criminal convictions, he argued that sufficient cause for debarment had been established under the principles of *Trap Rock Industries, Inc. v. Kohl,* 59 *N. J.* 471 (1971), *cert.* den., 405 *U. S.* 1065, 92 *S. Ct.* 1500, 31 *L. Ed.* 2d 796 (1972). In his view, the indictment alone would have justified suspen-

in 1970 on the death of Mario Gallo, and a new entity bearing the name Gallo Asphalt Co. was created with the estate of Mario Gallo as a partner. The Gallos have argued throughout that the now defunct partnership was the only culpable party, even though they entered a guilty plea for the reconstituted partnership. We agree with the Commissioner's conclusion that this attempted distinction between the two entities is meaningless in view of the continuity of operations and the identity of partners. For the sake of clarity and convenience, no distinction will be drawn between the two versions of Gallo Asphalt Co.

[4]He noted that suspension customarily followed an indictment, and served as a temporary measure until the resolution of criminal proceedings. Since appellants had already been convicted, the parties stipulated that there was no need to engage in two separate hearings. Counsel for appellants acknowledged that the proceeding could result in debarment.

sion; the guilty pleas were evidence that the charges in the indictment were true.

Appellants' counsel responded by asserting that neither Gene nor Vincent had been implicated in the criminal activity for which the companies had entered guilty pleas. He also described the terms of the plea bargain with the State, emphasizing the applicability of *R.* 3:9–2 and entering into evidence copies of Judge Ackerman's order. In addition, Gene and Vincent Gallo, counsel for the estate of Mario Gallo, and attorneys from the Attorney General's office testified on behalf of the companies. Although Gene and Vincent had been Mario's nominal equals while he was alive and had been directors, partners, and shareholders in the family businesses, they claimed to have taken no part in setting policy or in managing finances. The testimony, as supplemented by evidence in a later hearing, indicated that Mario had taken charge of the businesses from their father Thomas Gallo and had been the unquestioned chief executive officer, while his brothers confined themselves to running a Crushed Stone facility at Pompton Lakes which manufactured asphalt products. Specifically, the prosecuting attorneys testified that they had uncovered no information suggesting that Gene and Vincent had played a role in setting exorbitant prices or in arranging collusive bids with other contractors.

On December 31, 1974, Commissioner Sagner issued a Determination and Order debarring Gallo Asphalt, Gallo Corp. and any related businesses until October 30, 1976. Accordingly, they were prohibited from bidding on any contract with D.O.T., from acting as a subcontractor or material supplier on any such contract, and from serving as a contractor or material supplier on local-aid contracts with D.O.T. funds. In his order, Commissioner Sagner noted that:

. . . it has not been shown that Gene and Vincent [Gallo] were criminally culpable in the conspiracy . . . In my mind the taint that was created by a conspiracy against the competitive bidding system over a 14 year period was not absolved by the death of Mario Gallo.

*I interpret the guilty plea on October 29, 1974 by Gallo Asphalt Company and Passaic Crushed Stone Company, Incorporated, as a recognition of this taint.* [Emphasis supplied.]

At appellants' request, a second hearing was held on January 27, 1975 before the Commissioner. Appellants presented additional evidence showing that Mario Gallo exclusively managed the businesses without the participation of Gene or Vincent. On February 25, 1975 Commissioner Sagner issued a second Determination and Order reaffirming his earlier decision but modifying the order to an indeterminate debarment period; the Gallos could resume State work when they "demonstrate[d] to [his] satisfaction that they possess[ed] the requisite degree of responsibility in the sense of moral integrity." The Appellate Division affirmed in an unreported *per curiam* decision, and we granted appellants' petition for certification. 68 *N. J.* 488 (1975).

We need not pass on the grounds for the Commissioner's decision rejecting the Gallos' claim that they should not be held responsible for Mario's criminal conduct. Instead, we find that the appellants' guilty pleas should not have been received in evidence during the hearing. Judge Ackerman's orders specifically stated that:

. . . the plea of guilty by the defendant . . . entered and accepted by the Court today shall not be evidential *in any way in any civil proceeding now pending or which may be instituted in the future.* [Emphasis supplied.]

The Appellate Division did not address the propriety of the Commissioner's reliance upon the guilty pleas of the two firms because it thought that *R.* 3:9–2 and the order limiting the use of the pleas did not affect the use of the convictions resting thereon. It found that the two business entities were guilty of the charge alleged in the indictment based on the testimony of a witness for appellants, and concluded that the Gallos were not prejudiced by the Commissioner's use of the pleas.

However, the record shows that the essence of D.O.T.'s allegations against appellants was the admission of criminal guilt inherent in their pleas and the resulting convictions. The D.O.T. hearing was clearly a "civil proceeding" within the meaning of *R.* 3:9–2 and Judge Ackerman's orders, and therefore no reliance whatsoever should have been placed upon the pleas. This is so even though debarment hearings are not subject to the evidentiary formalities of a trial.[5] The terms and the spirit of the agreement entered into by the State and appellants precluded any evidential use of the pleas and convictions in subsequent civil proceedings. Thus, this case is not strictly analogous to other instances in which prior pleas of *nolo contendere* have been considered in disciplinary hearings. See *In re Berardi,* 23 *N. J.* 485 (1957); *In re Friedman,* 21 *N. J.* 273 (1956); *In re Devine,* 18 *N. J.* 67 (1955); *Kravis v. Hock,* 137 *N. J. L.* 252 (Sup. Ct. 1948).

Had it been clear that the pleas might have been utilized against them in the debarment proceeding, the Gallos might never have entered them, since the bulk of their business is with public entities. This is evidenced by the sworn testimony of appellants' counsel at the hearing:

> May I further say that the plea was entered because of the timing involved. The plea was entered so that we could quickly resolve our problems with those agencies that debarred us and in fact, after the entry of the plea the State of New Jersey, through the good offices of the Attorney General, saw to it that we were in fact

---

[5]New Jersey's Administrative Procedure Act (APA), which became effective in 1968, provides that in contested cases "the parties shall not be bound by rules of evidence whether statutory, common law, or adopted by the Rules of Court." *N. J. S. A.* 52:14B–10. It defines a contested case as

> "a proceeding, including any licensing proceeding, in which the legal rights, duties, obligations, privileges, benefits or other legal relations of specific parties are required by constitutional right or by statute to be determined by an agency by decisions, determinations, or orders, addressed to them or disposing of their interests, after opportunity for an agency hearing." *N. J. S. A.* 52:14B–2(b).

reinstated by making certain facts known to these various agencies. Moving to dismiss the indictment might I say, Mr. Heimlich, would have taken many, many months because first of all a judge could not have dismissed the indictment at that point. It was not a civil action and you don't have discovery in a criminal case and the judge would have to hear the State's case first before he could dismiss the indictment. That would have taken many, many months and because of the financial losses which these companies would have sustained, there would be no good reason for them to not enter a plea and save themselves financially at that point, rather than go on for six months or a year, with possible appeals to the Appellate Division, depending upon the outcome. It would have taken a considerable period of time.

Plea bargaining is part of our criminal practice. The Attorney General has honored the plea bargain. The trial judge asked Mr. Zauber, representing the State at the acceptance of the pleas:

Mr. Zauber, I gather you are satisfied, consent having been given, among other things, the interest of the State or the public are really not impaired in any way by these pleas.

Mr. Zauber responded:

That's correct, in view of the fact that the surviving principals of these two entities were not personally involved in any of the allegations contained in the indictment.

The Office of the Attorney General subsequently advised various State and local agencies, including that of respondent, of the above.

Because of the bargain, appellant could rightfully expect that no adverse inferences as to moral integrity would be drawn from the guilty plea. Basic fairness requires that the Commissioner honor the agreement when he is sitting as a quasi-judicial officer. *Cf., Santobello v. New York,* 404 *U. S.* 257, 92 *S. Ct.* 495, 30 *L. Ed.* 2d 427 (1971); *State v. Thomas,* 61 *N. J.* 314, 321–323 (1972). Moreover, this requirement does not undermine the Commissioner's power to uphold the integrity of the competitive bidding process

on D.O.T. projects. As Judge Ackerman stated in accepting the pleas:

Of course, in accepting the plea with that condition, it does not give any immunity, it merely means that the plea cannot be used in evidence in a civil matter. And if there should be any civil suit, or a follow-through, of course, the evidence can be presented but it simply means the pleas cannot be used as admissions.

The guilty pleas played a decisive role in the Commissioner's decision. Since the pleas should not have been allowed in evidence, this case will be remanded to the Commissioner for further consideration. We are eager to protect the public interest. The Commissioner may hold a hearing; any competent evidence may be offered to determine the "responsibility" of the present ownership. In the interim, Gallo Asphalt and Crushed Stone may bid for and accept business with any public entity.

Reversed and remanded.

CONFORD, P. J. A. D., Temporarily Assigned (concurring and dissenting in part).

I concur in the reversal, but regard the terms of the remand as insufficiently informative to the Commissioner as to the criteria he may employ in determining the "responsibility" of "the present ownership". To that extent, therefore, I dissent. I would confine the Commissioner on the remand to debarment criteria related to the moral unfitness of Gene and Vincent Gallo personally. I would expressly preclude him from debarring the Gallo business entities on the basis of their imputed unfitness ascribable to the derelictions of the deceased Mario Gallo. This precaution is necessary because the previous determinations of the Commissioner indicate a disposition to debar on that basis.

In the lead case in this area this Court made it unmistakably clear that "[t]he moral responsibility of a corporation is one and the same with the moral responsibility of the individuals who give it direction." *Trap Rock Industries*

*Inc. v. Kohl,* 59 *N. J.* 471, 482 (1971). Thus the proprietary identification with a corporation of one indicted for bribery was there held sufficient to warrant suspension of the corporation as a bidder while such identification continued. But, here, assuming the Commissioner on remand is unable to establish moral dereliction on the part of the surviving Gallo brothers personally, it would be fictional to impute *present* moral unfitness to the business entities, which are now the *alter egos* of the surviving brothers only, solely because of what Mario did in his lifetime. In the language of *Trap Rock Industries, supra,* he no longer "give[s] direction" to the businesses. To debar Gene and Vincent for the sins of Mario would not only subserve the unjust concept of guilt by association but prejudice the interests of the State by depriving it of the benefit of the availability of experienced and apparently reliable contractors.

CARTON, P. J. A. D., Temporarily Assigned (dissenting). The majority premises its reversal on the salutary principle that the terms and conditions of a plea bargain are to be scrupulously carried out by the State. See *Santobello v. United States,* 404 *U. S.* 257, 262, 92 *S. Ct.* 495, 30 *L. Ed.* 2d 427 (1971); *State v. Jones,* 66 *N. J.* 524, 526 (1975); *State v. Thomas,* 61 *N. J.* 314, 322 (1972). While I accept that premise, I cannot accept the conclusion implicit in the majority opinion that the Gallo business entities were either expressly or impliedly promised immunity from the consequences of their 13 years of wrongdoing.

A perusal of the record establishes beyond cavil that there was no such understanding. Indeed, the record demonstrates that Gene and Vincent Gallo, the corporate and partnership representatives responsible for entering the plea, were expressly informed that the acceptance of the guilty plea did not affect the State's right to bring debarment proceedings against the business entities.

## I.

In the process of accepting the pleas, as noted by the majority, the court had commented:

> Of course, in accepting the plea with that condition, *it does not give any immunity*, it merely means that the plea cannot be used in evidence in a civil matter. And if there should be any civil suit, or a follow-through, of course, the evidence can be presented but it simply means the pleas cannot be used as admissions. [emphasis added].

It is difficult to understand in what manner the above-quoted statement supports the majority's position that immunity was conferred. In the consent order entered by the trial court the Gallo businesses were promised only that "Such plea[s] of guilty shall not be evidential in any civil proceeding which may now be pending or which may be instituted in the future * * *."

This was the plea bargain in its entirety. In effect, the Gallo businesses[1] pleaded *non vult contendere,* or *nolo contendere,* to the charges contained in the indictments.[2] Affidavits submitted by the Attorney General on the motion to supplement the record after the oral argument make it crystal clear that promises of enterprise immunity from debarment were sought and rebuffed.[3]

---

[1]The Gallo Asphalt Company is organized as a partnership. The Gallo Asphalt Corporation and Passaic Crushed Stone Co., Inc. are organized as corporations.

[2]The terms *"non vult"* and *"nolo contendere"* are of virtually interchangeable meaning. New Jersey, for reasons purely of convenience, employs the term *"non vult."* See *Pressler, Current New Jersey Rules,* comment to *R.* 3:9-3.

[3]Deputy Attorney General Kenneth Zauber's affidavit states:

Rather than entering into an agreement to recommend to various bidding agencies that the Gallo companies not be debarred in consideration of the guilty pleas, as the appellants' attorney has alleged, I expressly advised Dino Bliablias, Esq., the attorney for the Gallo companies in the criminal proceedings, that I would make no such recommendation.

The State's position that the Gallo business entities were
not to be guaranteed immunity from debarment finds support
not only in the express understanding of the parties but also
in the realities of the situation. Is it conceivable that it was
the State's intention to allow the Gallo businesses to pur-
chase for so small a price an indulgence freeing the en-
tities of the consequence of 13 years of criminal activities?
In this connection, it should be noted that the maximum fine
that could be imposed as a consequence of the guilty plea was
$1,000. On the other hand, the bid-rigging corruption to
which the Gallo entities pleaded concerned public contracts
involving millions of dollars and the illegal siphoning off of
hundreds of thousands.

As noted, the affirmative evidence demonstrates that the
State made clear to the Gallos that it reserved the right to
consider the guilty pleas in subsequent debarment proceed-
ings. It is equally clear from the language of the agreement
itself that the entry of the guilty pleas was never intended
to foreclose the State from establishing the underlying facts
charged against the Gallo business entities in later proceed-
ings.

What then was the legal significance of this agreement? It
had no more and no less effect than a usual plea of *nolo
contendere* or *non vult* in any other criminal proceeding. The
chief feature of a plea of *non vult* (or *nolo contendere*) con-
cerns its use in a later proceeding. In this and only this re-
spect, it differs from a plea of guilty. See generally, 29 *Am.
Jur.* 2d, *Evidence,* § 702 at p. 760. A plea of *non vult* or
*nolo contendere* has been described as a "passive step," a step
which does not foreclose the prerogative of one entering the
plea from later contesting the issues of fact which underlay
the charges pleaded to. *Holly v. Bates,* 7 *N. J.* 191, 196
(1951). Professor Wigmore described the plea as "hypo-
thetical or ambiguous," and stated that the plea may not be
used in later proceedings as an admission. 4 *Wigmore, Evi-
dence* (Chadburn Rev. 1972), § 1066 at p. 81. By contrast,

a straightforward guilty plea precludes a pleader from a later assertion of innocence.

In *Hudson v. United States,* 272 *U. S.* 451, 47 *S. Ct.* 127, 71 *L. Ed.* 347 (1926), the origins of the *nolo contendere* plea were traced to the reign of Henry IV (1399–1413). After scholarly analysis of early English texts, the *Hudson* court concluded that the *nolo contendere* plea had its genesis in a prisoner's "implied confession," a plea for mercy allowable only in non-capital cases. 272 *U. S.* at 453, 47 *S. Ct.* 127, citing *Hawkins, Pleas of the Crown,* 8th ed., book 2, chapt. 31 at p. 460. Unlike an "express confession," the implied confession did not estop the defendant from pleading and proving his innocence in a subsequent civil action. 272 *U. S.* at 455, 47 *S. Ct.* 127. "Like the implied confession," the court analogized, "[a plea of *nolo contendere*] does not create an estoppel, but like the plea of guilty, it is an admission of guilt for the purposes of the case." *Id.* 272 *U. S.* at 455, 47 *S. Ct.* at 129. See generally, Anno., "Plea of Nolo Contendere or Non Vult Contendere," 89 *A. L. R.* 2d 540 (1963).

It has long been the settled law of New Jersey that a *nolo contendere* plea *qua* plea is not proper evidence of the pleader's participation in the events detailed in the charge to which the plea was entered. See, *e. g., State v. Pometti,* 12 *N. J.* 446, 453 (1953) ; *Holly v. Bates, supra,* 7 *N. J.* 191, 196 (1951) ; *Kravis v. Hock,* 136 *N. J. L.* 161, 165 (1947).

On the facts of this case, entry of an unqualified plea of guilty would have precluded the Gallo organizations from attempting to show that they had not participated in the price-fixing and bid-rigging schemes charged in the indictments. By entering *non vult* pleas the opportunity to make such a showing of innocence was preserved. In fact, however, defendant businesses never availed themselves of that opportunity. They did not deny or put in issue the guilt of the business. Indeed, they do not do so now.

As the Appellate Division properly noted, there was ample evidence presented to the Commissioner, other than the pleas

themselves, tending to prove the heavy involvement of the Gallo family businesses in the illegal activities for which the firms were indicted.

Deputy Attorney General Zauber, basing his testimony specifically on evidence gathered during the investigation, referred repeatedly to the criminal involvement of the Gallo companies. At one juncture he noted that the pleas were entered because the businesses "were indeed guilty of the charge [sic] as alleged in the indictment * * *." Deputy Attorney General Edwin Stier based his testimony on "the investigation as a whole, which included interviews of witnesses and people who participated directly in the meetings and transactions which are alleged in the indictment." Stier repeatedly testified that Mario Gallo participated in the bid-rigging schemes on behalf of the Gallo companies. In short, there was simply no attempt made to deny the fact that the Gallo companies — via Mario — engaged in a protracted bid-rigging scheme. The transcript of the debarment proceedings is replete with references to the criminal activity which underlay the debarment order.

But even if there was no proof of criminal wrongdoing on the part of the Gallo enterprises and even if the guilty plea could not be considered as evidence of guilt of those entities in the debarment proceedings, the judgment of conviction alone provides an adequate basis for affirming the Commissioner's determination.

Whatever else may be said concerning the use of a plea of *nolo contendere* in a collateral civil proceeding, it is settled that the plea leads directly to a judgment of conviction. Hence, in the current case, the Commissioner was dealing with two entities which had been convicted of participation in a bid-rigging conspiracy. Whether that conviction flowed from a plea of guilty, *nolo contendere* or the verdict of a judge or jury is of no moment. *Cf. State v. Henson,* 66 *N. J. L.* 601 (E. & A. 1901), holding that a plea of *nolo contendere* yields a conviction and that the conviction is admissible to impeach credibility.

In a proceeding having as its focus the fitness and responsibility of a party, the fact of a criminal conviction — *any* criminal conviction — is highly relevant. This is particularly so where the State employs its broad police powers to shore up public confidence in the qualifications of those who would engage in a particular occupation or where significant expenditures of public funds are in the offing.

In *In re Berardi,* 23 *N. J.* 485 (1957), the court held that proof of a plea of *nolo contendere* was admissible in a proceeding to terminate a private detective's license. The investigator had pleaded *nolo contendere* to charges of falsifying his federal income tax returns. Just as in *Berardi,* the Commissioner here is concerned with the "good character, competency and integrity" of state contractors. *In re Berardi, supra,* 23 *N. J.* at 493; *cf. Trap Rock Industries v. Kohl,* 59 *N. J.* 471, 481 (1971), *cert.* den., 405 *U. S.* 1065, 92 *S. Ct.* 1500, 31 *L. Ed.* 2d 796 (1972).

Moreover, it appears to be the rule in the vast majority of states that

the fact of [a] conviction upon [a plea of *nolo contendere*] may be shown in a later proceeding, and such a conviction subjects the defendant to all the consequences of a conviction in the same way as if it were after a plea of guilty or not guilty. [Anno., "Plea of Nolo Contendere," 89 *A. L. R.* 2d 450 (1963), § 42 at p. 604].

Certainly the *Berardi* view seems the correct one. There is simply no doubt that a *nolo* plea yields a conviction as that word is commonly understood. The court is free, following the plea, to proceed to judgment and to impose (as it did here) the maximum sentence. It would be a radical departure from this State's settled view of the effect of a *nolo* plea and subsequent sentence to reach the result urged here.

Unquestionably, the Commissioner's duty to involve the State solely with "responsible" bidders requires him to exclude from State business firms which lack moral integrity. *Trap Rock Industries v. Kohl* (Trap Rock I), 59 *N. J.* 471,

481 (1971), *cert.* den., 405 *U. S.* 1065, 92 *S. Ct.* 1500, 31 *L. Ed.* 2d 796 (1972). On the facts of this case, the business organizations involved were convicted of (and given the maximum sentences for) a criminal conspiracy that spanned many years, a conspiracy which was aimed at the very heart of the integrity of the competitive bidding system. See also *United States v. Addonizio,* 451 *F.* 2d 49 (3d Cir.), *cert.* den., 405 *U. S.* 936, 92 *S. Ct.* 949, 30 *L. Ed.* 2d 812 (1972), in which the criminal involvement of the Gallo enterprises in another aspect of the bid-rigging conspiracy is detailed. In *Trap Rock I,* the corporation's wrongdoing had no relation to its performance as a government contractor. In *Trap Rock Industries v. Sagner* (Trap Rock II), 133 *N. J. Super.* 99 (App. Div. 1975), aff'd by an equally-divided court 69 *N. J.* 599 (1976), there was only an inferential nexus between the wrong (a disguised illegal contribution to the election campaign of a former Governor of this State) and the corporation's place on the list of qualified State contractors.

Here, however, the Gallo business enterprises were convicted of a criminal conspiracy spanning more than a decade which successfully subverted the competitive bidding system. The Gallos' criminal activities could not more directly relate to their *ability,* as well as their willingness, to perform State contracts fully and honestly. The Commissioner was amply justified in taking the action that he did. Consequently, his action should be affirmed on the present record.

The majority concludes that the Commissioner should reconsider the Gallos' arguments on remand. It is not clear from its opinion what issue the Commissioner would be required to determine on the remand or the nature of the evidence admissible to determine it. If his determination on remand is to turn on responsibility of the business entities, it would seem to be a waste of time to require proof of the individual acts of criminal activity which resulted in an acknowledged conviction of these entities. If, on the other hand, the Commissioner is supposed to consider whether

the surviving partners were in any way implicated in their deceased brother's criminal acts, that issue is not involved on this appeal.

## II.

In *Trap Rock II, supra,* the Appellate Division concluded that where

corporate derelictions can be isolated and fixed to particular persons, the corporation's lack of moral responsibility in that situation should be synonymous with the moral defects of the responsible individuals. [133 *N. J. Super.* at 108].

That holding was derived in large measure from a statement in *Trap Rock I* that, "The moral responsibility of a corporation is one and the same with the moral responsibility of the individuals who gave it direction." *Trap Rock Industries v. Kohl,* 59 *N. J.* 471, 482 (1971), *cert.* den., 405 *U. S.* 1065, 92 *S. Ct.* 1500, 31 *L. Ed.* 2d 796 (1972). The language quoted from *Trap Rock I,* in context, was directed at the corporate entity's argument that the conduct of its individual principal should not be imputed to it, *i. e.,* the language was in aid of the enforcement of the Commissioner's prerogative to debar from State contracts those bidders whose responsibility was suspect. The effect of the Appellate Division's holding in *Trap Rock II,* while consistent with the literal holding of *Trap Rock I,* is inconsistent with the spirit of *Trap Rock I* and the underlying legislation.

In the current case there was no direct evidence linking the surviving Gallo brothers with the misconduct of the deceased brother. However, in view of the nature of that misconduct, its 13-year duration, and the fact that each of the brothers held a one-third interest in these closely held family businesses, it is not surprising that the Appellate Division found the cries of ignorance on the part of the surviving Gallo brothers inherently incredible. Recall that Gene and Vin-

423

cent were not mere "haulers of wood and drawers of water." They were principals, directors and officers with major interests in the business entities convicted of bid-rigging and corruption. Such a finding is not, however, necessary to support an order of debarment under the circumstances of this case.

I would reach the issue posed in *Trap Rock II* and conclude that a wrongdoer's continued active participation in the guilty entity's operations is not a prerequisite to an order debarring the entity when the entity has acknowledged criminal conduct or such conduct is factually established. The entities (and their principals) benefited from the illegal conduct of the deceased principal. It was the entities which were stained with corruption in the eyes of the public. The Gallo concerns did not cease to exist when Mario died. The business entities, not the surviving individuals, seek restoration of the privilege of contracting with the State. The aroma of corruption was not wafted away simply because its source was removed. In Justice Mountain's words:

[P]urification and penance are salutary, but they cannot safely be deemed the sole key to ultimate salvation in so sensitive an area as this. The sting of punishment is important and has been so recognized by the Legislature.
[w]ere it possible to obtain corporate absolution simply by the expulsion of the wrongdoer, it would take little imagination to perceive that public protection had been massively eroded. [*Trap Rock Industries, Inc. v. Sagner, supra*, 69 *N. J.* 599, 609 (Mountain, J., dissenting)].

The Commissioner — as protector of the public interest — should be allowed to determine when the circumstances warrant restoration of petitioners to the list of bidders deemed of sufficient responsibility to do business with the State. Until such time, they should not be privileged to do so.

I would affirm.

Justice MOUNTAIN authorizes me to state that he joins in this opinion.

*For reversal and remandment*—Chief Justice HUGHES and Justices SULLIVAN, PASHMAN and CLIFFORD—4.

*For affirmance*—Justice MOUNTAIN and Judge CARTON—2.

*Concurring and dissenting*—Judge CONFORD—1.